**HARISIADES v. SHAUGHNESSY, Acting District Director of Immigration and Naturalization at Port of New York.**

United States District Court
S. D. New York.

Feb. 9, 1950.

Carol King, Isidore Englander, New York City (Blanch Freedman, New York City, of counsel), attorneys for petitioner.

Irving H. Saypol, United States Attorney for the Southern District of New York, New York City (Clarke S. Ryan, Assistant United States Attorney, Lester Friedman, New York City, of counsel), attorney for respondent.

LEIBELL, District Judge.

The petitioner, Peter Harisiades, an alien, sued out a writ of habeas corpus on July 1, 1949, claiming that he had been arrested and was then illegally detained at Ellis Island, under a warrant of deportation. The warrant had been issued December 16, 1948 by the Acting Assistant Commissioner of Immigration, pursuant to an order of deportation made on that date by the Assistant Commissioner, under T. 8 U.S.C.A. § 137(g). The warrant recited the grounds for his deportation; among them, that he was a member of an organization (the Communist Party) which advises, advocates and teaches the overthrow of the Government of the United States by force and violence, and which circulates and distributes literature teaching and advocating that doctrine. Harisiades appealed to the Board of Immigration Appeals from the order of the Assistant Commissioner. Argument was had before the Board on April 19, 1949. The Board on May 13, 1949 affirmed the Commissioner's order on the two main grounds stated above. Harisiades was taken into custody on May 20, 1949.

The petitioner is a native of Greece. He was admitted to the United States with his father on March 7, 1916, when he was thirteen years old. In 1920 his father returned to Greece but the petitioner remained here. In 1925 he joined the Workers Party which changed its name to the Communist Party of the U.S.A. in 1929. He was an active organization worker from 1928 to 1930. From 1931 to 1932 he was a Party organizer and was one of the division executives of the Party. He was a secretary of the Greek Bureau of the Communist Party in this country from 1933 to 1937 and was associated with its publication, "Empros", from 1933 to 1939. He was arrested a number of times in Massachusetts for "strike activities" between 1928 and 1930, and for "unemployment demonstrations" in West Virginia in 1930. Petitioner continued as a member of the Communist

Party of the United States of America until October 1939, when, he claims, he was formally dropped by that Party, as a non-citizen.[1]

The deportation proceedings date back a score of years. On April 12, 1930 a warrant of arrest was issued charging Harisiades with having been found in the United States in violation of the law, on the ground that at that time he was a member of or affiliated with an organization which taught or advocated the overthrow of the Government of the United States by force or violence. The warrant was based on a sworn statement, which Harisiades had made on March 6, 1930, to the effect that he was a Section organizer of the Communist Party at New Bedford, Massachusetts, that he did not believe in the Government of the United States, and that it was the purpose of his party to overthrow our form of government, although he denied that he or his Party believed in the use of force or violence to accomplish that purpose. [A search was made for him in several states, but the 1930 warrant was not served. Meanwhile he had assumed various aliases.[2] In 1937 he married an American citizen. He has two children. In 1943 his alien registration record was checked and later his location was ascertained; but it was not until May 2, 1946 that the warrant of deportation was served and he was taken into custody.] During the deportation proceed-

ing that followed his arrest, he was released either on bail or on his own recognizance.

After his arrest in May 1946, the following charges were then lodged against him in the deportation proceeding:—

"(1) Act of October 16, 1918, as amended—Found to have been after entry a member of the following class set forth in Section 1 of said Act: An alien who believes in, advises, advocates, or teaches the overthrow by force or violence of the Government of the United States.

"(2) Act of October 16, 1918 as amended—Found to have been after entry a member of the following class set forth in Section 1 of said Act: An alien who is a member of an organization, association, society or group that believes in, advises, advocates, or teaches the overthrow by force or violence of the Government of the United States.

"(3) Act of October 16, 1918 as amended—Found to have been after entry a member of the following class set forth in Section 1 of said Act: An alien who is affiliated with an organization, association, society or group that believes in, advises, advocates, or teaches the overthrow by force or violence of the Government of the United States."

The pertinent parts of the statute are quoted below.[3]

1. The revised constitution of the Communist Party of the U.S.A. (Ex. 4) adopted at its Tenth National Convention in May 1938 provided:—
   "Article III
   "Membership
   "Section 1. Any person, eighteen years of age or more, regardless of race, sex, color, religious belief, or nationality, who is a citizen or who declares his intention of becoming a citizen of the United States, and whose loyalty to the working class is unquestioned, shall be eligible for membership."
   But a provision of the By-Laws relating to membership stated:—
   "It is within the provision of Article III, Section 1 of the Constitution that the following are eligible to membership in the Communist Party:
   "a. Persons who, by some present unjust and undemocratic laws, are excluded

from citizenship and disbarred from legally declaring their intentions of becoming citizens;"
   Harisiades while under arrest in New Bedford, Massachusetts, made a statement (Ex. 6) to the Inspector in Charge on March 6, 1930, in which he said that he had taken out his "first papers" at Canton, Ohio, in 1922 or 1923.
   Under the above quoted provisions of the Constitution and By-Laws it does not appear that Harisiades' non-citizenship status barred him from membership in the Communist Party in the U.S.A. in 1939.

2. At different times he has used the names Pete Hagelias; Panagiotis Hatzikas; Panagiotis Hadjielias; Pete Harrison.

3. The statute of October 16, 1918, 40 Stat. 1012, amended June 5, 1920, 41 Stat. 1008, and further amended in June 1940,

Hearings were held before a presiding inspector of the Bureau of Immigration and Naturalization, on October 15, 1946 and on January 30–31, 1947. On March 11, 1947 the Presiding Inspector made a report, covering 65 pages, and recommended petitioner's deportation to Greece. The report contained proposed Findings of Fact and Conclusions of Law as to deportability. The record was forwarded to the Central Office and on May 14, 1947 the attorney for Harisiades filed exceptions to the report. On August 5, 1947 the Commissioner ordered that the hearing be reopened for the proper authentication of documents already introduced, for the reception of additional evidence, and for the lodging of certain additional charges.[4]

The hearing was reopened February 18–19, 1948. Two additional charges were lodged as follows:—

"(4) The Act of October 16, 1918, as amended, in that he is found to have been after entry, a member of the following class set forth in Section I of said Act: An alien who is a member of and affiliated with an organization, association, society, and group that advises, advocates, and teaches the overthrow by force and violence of the Government of the United States.

"(5) The Act of October 16, 1918, as amended, in that he is found to have been, after entry, a member of the following class set forth in Section I of said Act: An alien who is a member of and affiliated with an organization, association, society, and group, that writes, circulates, distributes, prints, publishes, and displays, and causes to be written, circulated, distributed, printed, published and displayed, and that has in its possession for the purpose of circulation, distribution, publication, issue, and display, written and printed matter advising, advocating, and teaching the overthrow by force and violence of the Government of the United States."

The reopened hearings were continued before the same Presiding Inspector on March 9–10, 1948. He made a report of 300 pages, with proposed findings and conclusions, on June 24, 1948. It is a very complete and thorough report. The case then went to the Commissioner's office where it was considered and reviewed by the Chief Examiner, in a report dated December 16, 1948, covering 46 pages. He concluded that the government had met its burden of proof on all of the lodged charges by ample substantial evidence, and submitted Findings of Fact and Conclusions of Law.[5]

---

54 Stat. 673, 8 U.S.C.A. § 137: which provides in part as follows:—

"Any alien who, at any time, shall be or shall have been a member of any one of the following classes shall be excluded from admission into the United States:"

\* \* \* \* \* \* \*

"(c) Aliens who believe in, advise, advocate, or teach, or who are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States \* \* "

"(e) Aliens who are members of or affiliated with any organization, association, society, or group, that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display, any written or printed matter of the character described in subdivision (d)" [advising, advocating or teaching the overthrow by

force or violence of the Government of the United States.]

"(g) Any alien who was at the time of entering the United States, or has been at any time thereafter, a member of any one of the classes of aliens enumerated in that section, shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in sections (enumerated) of this title. The provisions of this section shall be applicable to the classes of aliens mentioned therein, irrespective of the time of their entry into the United States."

(The Immigration Act of February 5, 1917 is found in 39 Stat. 874 [8 U.S.C.A. § 101 et seq.]).

4. The Commissioner for proper cause at any time prior to an appeal from his order, may direct a reopening of the record of hearing. 8 CFR 150.8.

5. "Findings of Fact: Upon the basis of all the evidence presented, it is found:

"(1) That the respondent is an alien, a native and citizen of Greece;

"(2) That the respondent was admitted into the United States for permanent res-

The Chief Examiner recommended that Harisiades be deported to Greece on five charges [6] and the Assistant Commissioner "So Ordered". On the same day, December 16, 1948, a warrant of deportation was issued which embodied those charges. Harisiades appealed.

On April 19, 1949 the Board of Immigration Appeals heard oral argument on the appeal from the Assistant Commis-

idence on March 7, 1916 at New York and has remained here since;

"(3) That the respondent was an active member/affiliate in good standing of the Communist Party of the United States of America from at least 1925 to October 1939 and that during such period at least that organization believed in, advised, advocated, and taught the overthrow of the government of the United States by force and violence;

"(4) That the respondent was affiliated with the Communist International from at least 1925 to October 1939, and that during such period at least that organization believed in, advised, advocated, and taught the overthrow of the government of the United States by force and violence;

"(5) That the respondent was an active member/affiliate in good standing of the Communist Party of the United States of America from at least 1925 to October 1939 and that during such period at least that organization circulated and distributed, written and printed matter advising, advocating, and teaching the overthrow of the government of the United States by force and violence;

"(6) That the respondent, during at least from 1925 to October 1939 believed in the overthrow of the government of the United States by force and violence, and continues to hold the same views thereon since October 1939;

"(7) That during at least from 1925 to October 1939 the Communist Party of the United States of America was affiliated with the Communist International.

"Conclusions of Law: Upon the basis of the foregoing findings of fact, it is concluded:

"(1) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation, in that after entry, he was a member of the following class set forth in Section 1 of said Act:

"An alien who is affiliated with an organization, that believes in, advises, advocates, and teaches the overthrow of the Government of the United States by force, and violence, i. e. the Communist International;

"(2) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation in that after entry, he was a member of the following class set forth in Section 1 of said Act:

"An alien who is a member of and affiliated with an organization, that advises, advocates, and teaches the overthrow of the Government of the United States by force and violence, i. e. the Communist Party of the United States of America;

"(3) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation in that after entry, he was a member of the following class set forth in Section 1 of said Act:

"An alien who is a member of and affiliated with an organization, that circulates and distributes, and causes to be circulated and distributed, written and printed matter advising, advocating, and teaching the overthrow of the Government of the United States by force and violence, i. e. The Communist Party of the United States of America;

"(4) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation, in that after entry, he was a member of the following class set forth in Section 1 of said Act:

"An alien who believes in, the overthrow of the Government of the United States by force and violence;

"(5) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation, in that after entry, he was a member of the following class set forth in Section 1 of said Act:

"An alien who is a member of an organization, that believes in, advises, advocates, and teaches the overthrow of the Government of the United States by force and violence, i. e. The Communist Party of the United States of America;

"(6) That the respondent is *not* subject to deportation on the ground that he has been found in the United States in violation of the Act of October 16, 1918, as amended by the Act of June 5, 1920, in that he *is* a member of, or affiliated with an organization, association, society, or group that believes in, advises, advocates, or teaches the overthrow by force or violence of the Government of the United States or of all forms of law;

"(7) That under Section 20 of the Immigration Act of February 5, 1917, the respondent is deportable to Greece at Government expense."

6. "(1) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation, in that after entry,

sioner's order of December 16, 1948. The Board of Appeals filed an opinion dated May 13, 1949, from which I quote the following:—

"We have carefully considered the documentary evidence and the oral testimony in this case. We have reviewed the analyses of the evidence by the Presiding Inspector and the Assistant Commissioner. We find, on the basis of the evidence adduced and the foregoing court decisions, that during the period of the respondent's membership in the Communist Party of the United States of America, it advocated the overthrow of the Government of the United States by force and violence, and it distributed printed matter which so advocated.

"The Assistant Commissioner found the respondent deportable on several additional grounds. We do not sustain these other grounds of deportation. We find that the evidence of record does not establish that the respondent personally believed in or advocated the overthrow of the Government of the United States by force or violence. Since the respondent has admitted membership in the Communist Party of the United States, we believe that the grounds of deportation based on affiliation are, at the very best, superfluous.

"The order of deportation will be affirmed on the grounds that after entry into the United States the respondent became a member of an organization which advocated the overthrow by force and violence of the Government of the United States, and which distributed printed matter that so advocated."

The Board of Immigration Appeals ordered "that the appeal from the decision of the Assistant Commissioner be dismissed".

At the hearings and on the appeals, from the time he was taken into custody in May 1946, Harisiades has been represented by counsel of his own choosing.

After the decision of the Board of Immigration Appeals on May 13, 1949, Harisiades was taken into custody on May 20, 1949 pursuant to the warrant of deportation dated December 16, 1948. He filed an application in this Court for review under the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq.,[7] which was denied by Judge Bondy on July 1st. The Judge suggested that a petition for a writ of habeas corpus was the proper remedy. A petition for a writ was filed the same day. After several adjournments it came on for a hearing before me on July 19, 1949. At that time an application for bail was made pending decision on the writ. In view of the size of the record and the time it would take to review it, and because of the length of time the matter had been pending in the

he was a member of the following class set forth in Section 1 of said Act:

"An alien who is affiliated with an organization, that believes in, advises, advocates, and teaches the overthrow of the Government of the United States by force and violence;

"(2) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation in that after entry, he was a member of the following class set forth in section 1 of said Act:

"An alien who is a member of and affiliated with an organization, that advises, advocates, and teaches the overthrow of the Government of the United States by force and violence.

"(3) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation in that after entry, he was a member of the following class set forth in section 1 of said Act:

"An alien who is a member of and affiliated with an organization, that circulates and distributes, and causes to be circulated and distributed, written and printed matter advising, advocating, and teaching the overthrow of the Government of the United States by force and violence;

"(4) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation, in that after entry, he was a member of the following class set forth in Section 1 of said Act:

"An alien who believes in, the overthrow of the Government of the United States by force and violence;

"(5) That under the Act of October 16, 1918, as amended, the respondent is subject to deportation, in that after entry, he was a member of the following class set forth in Section 1 of said Act:

"An alien who is a member of an organization, that believes in, advises, advocates, and teaches the overthrow of the Government of the United States by force and violence."

7. See Connor v. Miller, 2 Cir., 178 F.2d 755.

Immigration Bureau during the greater part of which the alien was released on his own recognizance, I admitted the petitioner to bail.[8] The order fixing bail contained a provision that Harisiades report at regular intervals to the Immigration authorities and that he refrain from any activities that might be hostile to the best interests of the United States. Sometime thereafter counsel submitted briefs.

A number of points have been raised by petitioner's counsel but the three main contentions are (1) that the Communist Party of the United States, during the time of petitioner's membership (1925–1939), did not teach or advocate the overthrow of the Government of the United States by force or violence and did not distribute literature teaching that doctrine; (2) that the statute, 8 U.S.C.A. § 137, is unconstitutional, as in violation of the First and Fifth Amendments of the Constitution of the United States; and (3) that the June 1940 amendment of the statute, 54 Stat. 673, is, in respect to the charges against Harisiades, an ex post facto law and for that reason unconstitutional. The first contention raises an issue of fact; the second and third, questions of law.

In the case at bar the Presiding Inspector, the Chief Examiner and the Assistant Commissioner found that Harisiades is "an alien who believes in the overthrow of the Government of the United States by force and violence", in addition to being a member of and affiliated with an organization which advocates and teaches that doctrine and circulates literature to that effect. But the Board of Appeals held that the record did not establish that Harisiades personally believed in or advocated the overthrow of the Government of the United States by force or violence. Footnote #

4 of the Board's opinion states:—"From 1931 to 1932 he was an organizer for the Communist Party and from 1933 to 1937 he served as secretary of the Greek Bureau of the Communist Party—a subdivision thereof. He served in an editorial capacity on its publication 'The Empros' from 1933 to about October 1939. His membership in the Communist Party ended in October 1939 because the Communist Party dropped non-citizens from its rolls". He was a paid organizer and secretary.

As Chief Justice Stone observed in his dissenting opinion in Schneiderman v. United States, 320 U.S. 118, at page 197, 63 S.Ct. 1333, at page 1370, 87 L.Ed. 1796: "It is possible, though not probable or normal, for one to be attached to principles diametrically opposed to those, to the dissemination of which he has given his life's best effort. But it is a normal and sensible inference which the trier of fact is free to make that his attachment is to those principles rather than to constitutional principles with which they are at war. A man can be known by the ideas he spreads as well as by the company he keeps."

Schneiderman was an organization secretary of the Communist Party in California in 1930 and later in Connecticut and in Minnesota.

Mr. Justice Murphy in the majority opinion in the Schneiderman case remarked:— "At this point it is appropriate to mention what will be more fully developed later— that under our traditions beliefs are personal and not a matter of mere association, and that men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles." [9]

---

8. See United States ex rel. Pirinsky v. Shaughnessy, 2 Cir., 177 F.2d 708, September 30, 1949.

9. I believe that that observation does not apply to membership in the Communist Party of the United States, which during Harisiades membership was a Section of the Communist International. The 1928 Program of the Communist International (Ex. 5A); the 1934 Manifesto and the Principal Resolutions of the 8th Convention of the Communist Party of the United States (Ex. 10); Stalin's 1929 speeches on the American Communist Party (Ex. 46); and the membership requirements contained in a typical membership book (Ex. 18) show how strict is the discipline exercised by the Communist Party over its members. It is more than a political party. It is an organized revolutionary group.

Mr. Justice Murphy's opinion (the majority opinion) in the Schneiderman case states also:—"There is a material difference between agitation and exhortation calling for present violent action which creates a clear and present danger of public disorder or other substantive evil, and mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time—prediction that is not calculated or intended to be presently acted upon, thus leaving opportunity for general discussion and the calm processes of thought and reason."

And the court concluded that—"Because of this difference we may assume that Congress intended, by the general test of 'attachment' (i. e. to the principles of the constitution of the United States) in the 1906 Act, to deny naturalization to persons falling into the first category but not to those in the second."

The majority opinion in the Schneiderman case held also, that—"Where two interpretations of an organization's program are possible, the one reprehensible and a bar to naturalization and the other permissible, a court in a *denaturalization proceeding,* assuming that it can re-examine a finding of attachment upon a charge of illegal procurement, is not justified in cancelling a certificate of citizenship by imputing the reprehensible interpretation to a member of the organization in the absence of overt acts indicating that such was his interpretation."

In the case at bar Harisiades testified that he did not believe in the overthrow of the Government of the United States by force or violence.[10] The Presiding Inspector who saw him testify concluded otherwise. The Presiding Inspector, the Chief Examiner, the Acting Commissioner and the Board of Appeals all agreed that the Communist Party during the long period of Harisiades membership, advocated and taught the overthrow of the Government of the United States by force and violence and distributed literature to that effect.

Harisiades was more than an ordinary member of the Party. He had advanced from the rank and file, as Schneiderman had. But, if the Supreme Court did not consider all of Schneiderman's activities on behalf of the Communist Party as sufficient to justify the conclusion that Schneiderman believed in the overthrow of the Government of the United States by force and violence, the Board of Immigration Appeals could reach a like conclusion as to Harisiades. If I were free to do so, I would accept the view expressed in the paragraph quoted above from the dissenting opinion of Mr. Justice Stone. It seems to me to be more logical.

Petitioner's counsel states that "the only question of fact in the case is whether, during Harisiades' membership (1925–1939), the Communist Party of the United States of America believed in or advocated the violent overthrow of this Government, and whether it distributed literature containing such advocacy".

In Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 1453, 89 L.Ed. 2103 decided June 18, 1945, the majority opinion written by Mr. Justice Douglas held that Bridges had not had a fair hearing on the issue of his membership in the Communist Party because certain evidence (statements allegedly made to an investigating officer by a witness who was called by the government and denied making some parts of the statements) was improperly received, and where but for that evidence it was wholly speculative whether the requisite finding would have been made. The majority of the court held that the use of the ex parte statements was highly prejudicial. The majority also held that Bridges had been ordered deported "on a misconstruction of the term 'affiliation' as used in the statute". In the case at bar Harisiades admitted his membership in the Communist Party of the U. S. A. and the Board of Immigration Appeals considered the charge of "affiliation" as superfluous.

---

10. In 1930 he had stated (Ex. 6) that although he did not believe in the government of the United States as then constituted, and although his party believed in the overthrow of the government, they did not believe in force and violence.

The majority opinion in Bridges v. Wixon, supra, a deportation case, did not discuss the evidence on the question of whether the Communist Party of the U. S. A. advocated the overthrow of the Government by force or violence. But Mr. Justice Murphy in a concurring opinion stated:—"Proof that the Communist Party advocates the theoretical or ultimate overthrow of the Government by force was demonstrated by resort to some rather ancient party documents, certain other general Communist literature and oral corroborating testimony of Government witnesses. Not the slightest evidence was introduced to show that either Bridges or the Communist Party seriously and imminently threatens to uproot the Government by force or violence."

Chief Justice Stone in a dissenting opinion (in which Mr. Justice Roberts and Mr. Justice Frankfurter joined) stated:—"As we are of opinion that the finding of Bridges' membership in the Communist Party, standing alone, supports the deportation order, and that the finding is supported by evidence, we deem it unnecessary to consider other contentions to which the Court's opinion is principally directed." The dissenting opinion did not discuss the evidence relating to the teachings of the Communist Party.

However, Chief Justice Stone had discussed evidence on that question in a dissenting opinion (in which Mr. Justice Roberts and Mr. Justice Frankfurter joined) in Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 1369, 87 L.Ed. 1796, decided June 21, 1943, a denaturalization case, and had expressed the opinion that the evidence in that case was such that—"On the record before us it would be difficult for a trial judge to conclude that petitioner was not well aware that he was a member of and aiding a party which taught and advocated the overthrow of the Government of the United States by force and violence."

The period under consideration in that case was from 1922 to 1927. Schneiderman was naturalized in 1927.

In the majority opinion, written by Mr. Justice Murphy in the Schneiderman case, the Court held:—"We do not say that a reasonable man could not possibly have found, as the district court did, that the Communist Party in 1927 actively urged the overthrow of the Government by force and violence. But that is not the issue here."

The Court held that the Government failed, in the *denaturalization* action against Schneiderman, to prove any lack of attachment on his part to the principles of the Constitution of the United States, "by clear, unequivocal and convincing" evidence. Mr. Justice Murphy also stated:—

"For some time the question whether advocacy of governmental overthrow by force and violence is a principle of the Communist Party of the United States has perplexed courts, administrators, legislators, and students. On varying records in deportation proceedings some courts have held that administrative findings that the Party did so advocate were not so wanting in evidential support as to amount to a denial of due process,[29] others have held to the contrary on different records,[30] and some seem to have taken the position that they will judicially notice that force and violence is a Party principle.[31] This Court has never passed upon the question whether the Party does so advocate, and it is unnecessary for us to do so now." [11]

"29. In re Saderquist, D.C., 11 F.Supp. 525; Skeffington v. Katzeff, 1 Cir., 277 F. 129; United States ex rel. Vojewvic, v. Curran, 2 Cir., 11 F.2d 683; Kenmotsu v. Nagle, 9 Cir., 44 F.2d 953; Sormunen v. Nagle, 9 Cir., 59 F.2d 398; Branch v. Cahill, 9 Cir., 88 F.2d 545; Ex parte Vilarino, 9 Cir., 50 F.2d 582; Kjar v. Doak, 7 Cir., 61 F.2d 566; Berkman v. Tillinghast,

11. A jury, in a criminal prosecution in this Court against eleven of the top officers of the Communist Party of the United States, recently (October 1949) convicted all of the defendants of having conspired to advocate and teach the duty and necessity of overthrowing and destroying the government of the United States by force and violence. 54 Stat. 671. Under the law, the proof required for their conviction on the criminal charge was that their guilt be established beyond a reasonable doubt.

1 Cir., 58 F.2d 621; United States [ex rel. Lisafeld] v. Smith, D.C., 2 F.2d 90; United States ex rel. Abern v. Wallis, D.C., 268 F. 413.

"30. Strecker v. Kessler, 5 Cir., 95 F.2d 976; 2d, 5 Cir., 96 F.2d 1020, affirmed on other grounds, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082; Ex parte Fierstein, 9 Cir., 41 F.2d 53; Colyer v. Skeffington, D.C., 265 F. 17, reversed sub nom. Skeffington v. Katzeff, 1 Cir., 277 F. 129.

"31. United States ex rel. Yokinen v. Commissioner, 2 Cir., 57 F.2d 707; United States [ex rel. Ohm] v. Perkins, 2 Cir., 79 F.2d 533; United States ex rel. Fernandas v. Commissioner, 2 Cir., 65 F.2d 593; Ungar v. Seaman, 8 Cir., 4 F.2d 80; Ex parte Jurgans, D.C., 17 F.2d 507; United States ex rel. Fortmueller v. Commissioner, D.C., 14 F.Supp. 484; Murdoch v. Clark, 1 Cir., 53 F.2d 155; Wolck v. Weedin, 9 Cir., 58 F.2d 928."

However, the majority opinion in the Schneiderman case did discuss some of the documentary evidence on that issue—the "Communist Manifesto" of Marx and Engels proclaimed in 1848; "State and Revolution" by Lenin, written in August 1917; the "Statutes, Theses and Conditions of Admission to the Communist International" adopted August 1930 printed in 1923; the "Theory and Practice of Leninism" written by Stalin and printed in 1924 or 1925. The court added:—"The Government also sets forth excerpts from other documents which are entitled to little weight because they were published after the critical period", i.e. after 1927 when Schneiderman received his certificate of citizenship. Those other documents were:—(a) Program of the Communist International adopted in 1928 and published by the Workers Library Publishers Inc. in 1929; (b) Programme of the Young Communist International, published in 1929; (c) "Why Communism", written by Olgin and published first in 1933 by the Workers Library Publishers. The majority opinion quoted excerpts from the documents published prior to 1927 and styled them "bombastic excerpts", and stated:—"A tenable conclusion from the foregoing is that the Party in 1927 desired to achieve its purpose by peaceful and democratic means, and as a theoretical matter justified the use of force and violence only as a method of preventing an attempted forcible counter-overthrow once the Party had obtained control in a peaceful manner, or as a method of last resort to enforce the majority will if at some indefinite future time because of peculiar circumstances constitutional or peaceful channels were not longer open." [12]

The majority opinion stated:—"We do not decide what interpretation of the Party's attitude toward force and violence is the most probable on the basis of the present record."

Concerning that question Chief Justice Stone, in his dissent, stated: 320 U.S. 190,

12. The Presiding Inspector, in his opinion in the Harisiades case, takes issue with the interpretation given in the majority opinion to certain excerpts from the writings of Lenin and Stalin, which are referred to in footnotes (26), (50) and (51) of the majority opinion in the Schneiderman case. Indeed Stalin's interpretation of Leninism appears to be the direct opposite of that given by the United States Supreme Court as "a tenable conclusion". In his "Foundations of Leninism" (Ex. 22 at p. 56) Stalin states:—

"In other words, the law of violent proletarian revolution, the law of the smashing of the bourgeois state machine as a preliminary condition for such a revolution, is an inevitable law of the revolutionary movement in the imperialist countries of the world.

"Of course, in the remote future, if the proletariat is victorious in the most important capitalist countries, and if the present capitalist encirclement is replaced by a socialist encirclement, a 'peaceful' path of development is quite possible for certain capitalist countries, whose capitalists, in view of the 'unfavourable' international situation, will consider it expedient 'voluntarily' to make substantial concessions to the proletariat. But this supposition applies only to a remote and possible future. With regard to the immediate future, there is no ground whatsoever for this supposition.

"Therefore, Lenin is right in saying:—

" 'The proletarian revolution is impossible without the forcible destruction of the bourgeois state machine and the substitution for it of a *new one* * * *.' (Selected Works, Vol. VII, p. 124)"

63 S.Ct. 1367, 87 L.Ed. 1796. "From the beginning, and during all times relevant to this inquiry, there is evidence that the Communist Party organizations advocated the overthrow of capitalistic governments by revolution to be accomplished, if need be, by force of arms. We need not stop to consider the much discussed question whether this meant more than that force was to be used if established governments should be so misguided as to refuse to make themselves over into proletarian dictatorships by amendment of their governmental structures, or should have the effrontery to defend themselves from lawless or subversive attacks. For in any case the end contemplated was the overthrow of government, and the measures advocated were force and violence."

Chief Justice Stone, in an appendix annexed to his dissenting opinion in the Schneiderman case, sets forth a number of excerpts from "Statutes, Theses and Conditions of Admission to the Communist International" (adopted by the Second Congress of the Communist International July-August 1929) and also excerpts from "State and Revolution" by Lenin. Chief Justice Stone also quoted from the "Theses" and the "Communist Manifesto" and from Stalin's "The Theory and Practice of Leninism", in the body of his opinion. Referring to Lenin's book, "State and Revolution", Chief Justice Stone stated: "The Party teachings in this and other publications were that revolution by force of arms was a universal principle and consequently one which embraced the United States,[12a] and obviously was intended to do so when taught in Communist classes in the United States". Stalin's book on "The Theory and Practice of Leninism" was also quoted to support that conclusion.

The same questions were considered by the Presiding Inspector in the case at bar (the Harisiades case) on a record which includes eleven years of Communist Party activities, and some pronouncements and publications that were not before the high court in the Schneiderman case. The period involved in the Schneiderman case was 1922 to 1927; in the Bridges case, 1933 to 1937. The period in the Harisiades case covers 1925 to 1939. The Schneiderman opinion was written in June 1943; the Bridges v. Wixon opinion in June 1945.

The Presiding Inspector in the case at bar discussed the documentary evidence relating to the advocacy by the Communist Party of the use of force and violence in the proletariat revolution, for which the members of the Party were to be prepared to act as the vanguard of the attack. It is not necessary to go back to any "ancient documents" to show that in our time this has been the basic doctrine of the Communist International and the Communist Party of the U.S.A. A proletariat revolution employing force and violence is advocated in Lenin's "State and Revolution", written in 1917 (Ex. 20). The theme is again referred to in Lenin's "Left Wing Communism, An Infantile Disorder", 1920, (Ex. 21); and expounded in the "Foundations of Leninism" by Stalin, written in 1924, (Ex. 22). The program of the Communist International, adopted in 1928, (Ex. 5A) stress it. "The Struggle Against Imperialist War and the Tasks of the Communists", set forth in Resolutions of the Sixth World Congress of the Communist International (1928) (Ex. 27); Stalin's "Problems of Leninism", 1926 (Ex 23); Thesis of the Thirteenth Plenum of the Executive Committee of the Communist International (1933) published in 1934 (Ex. 11); Manifesto and Principal Resolutions adopted by the Eighth Convention of the Communist Party of the U.S.A. held April, 1934 (Ex. 10); Resolutions of the Seventh Communist International. August 1935 (Ex. 47)—all these documents are the modern exposition of the Communist doctrine of violent revolution, developed a century ago by Marx and Engels, and restated by Lenin and Stalin, with detailed instructions as to their modern application. Bluntly they proclaim the basic communistic doctrine of the violent overthrow of bourgeois "capitalist" governments (including the United States of America) and the seizure of power by force.

12a. See the quotation from "State and Revolution" in the Appendix to Chief Justice Stone's opinion.

If the words used in these pronouncements of the Communist International and of Lenin and Stalin, adopted and circulated by the Communist Party of the U.S.A. are given their plain every-day meaning, they state the Communist doctrine of the overthrow of government by force and violence as the way to power, so clearly that it cannot be obscured by calling it a defensive measure only. Chief Justice Stone exposed as ridiculous that palliation of the Communist doctrine of violent revolution.

Karl Marx stated in his Manifestos (Ex. 19) "The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions". Lenin in his "State and Revolution" put it this way:—"the liberation of the oppressed class is impossible not only without a violent revolution, but also without the destruction of the apparatus of state power, which was created by the ruling class". (Ex. 20 at p. 9) And "The necessity of systematically fostering among the masses this and just this point of view about violent revolution lies at the root of the whole of Marx's and Engel's teaching. * * * The replacement of the bourgeois by the proletarian state is impossible without a violent revolution" (Ex. 20 at p. 20). And finally—"Opposition and general political struggle are beside the point; we are concerned with the revolution. And revolution consists in the proletariat's destroying the 'administration apparatus' and the whole state machinery, and replacing it by a new one consisting of the armed workers". (Ex. 20 at p. 96).

In his book entitled "Left Wing Communism and Infantile Disorder", Lenin refers frequently to the lessons to be drawn from the 1905 and 1917 Russian revolutions. "There is a strike movement unprecedented anywhere in the world for its extent and acuteness. The economic strike grows into a political strike, and the latter into insurrection. The relations between the proletariat as the leader and the vacillating, unstable peasantry, as the led, are tested in practice. The Soviet form of organization is born in the spontaneous development of the struggle". (Ex. 21, p. 12-13). And "At that time (1905) the boycott (of the Duma) proved correct, not because non-participation in the reactionary parliaments is correct in general, but because we correctly estimated the objective situation that was leading to the rapid transformation of mass strikes into a political strike, and then into a revolutionary strike, and then into insurrection". (Ex. 21 at p. 20) Lenin later points out how the presence of a Soviet opposition within a bourgeois parliament can be used, and asserts that the experience of many revolutions show "how particularly useful during a revolution is the combination of mass action outside the reactionary parliament with an opposition sympathetic to (or, better still, directly supporting) the revolution inside this parliament". (Ex. 21 at p. 45) The following tactical advice is given by Lenin to Communist leaders in bourgeois democracies who might favor a policy of "No compromise, no manoeuvers":—"To tie one's hands beforehand, openly to tell the enemy, who is at present better armed than we are, whether we shall fight him, and when, is stupidity and not revolutionariness. To accept battle at a time when it is obviously advantageous to the enemy and not to us is a crime; and absolutely worthless are those political leaders of the revolutionary class who are unable 'to tack, manoeuvre and compromise' in order to avoid an obviously disadvantageous battle". (Ex. 21, p. 59)

This last quotation seems to me to expose the fallacy and delusion of the so-called "clear and present danger" rule in interpreting and applying the language of T. 8 U.S.C.A. § 137 and similar statutes, and the real danger to our national security that lurks in a judicial interpretation of the writings of leading Communists and of the programs and resolutions of the Party conventions, as "mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time".

Stalin, in his "Foundations of Leninism" (Ex. 22) restates the principles of Leninism. He writes in his Introduction that Leninism is not just the application of Marxism to the peculiar situation in Russia. "* * * We know, however, that Lenin-

ism is not merely a Russian, but an international phenomenon rooted in the whole of the international development. * * * The whole truth about Leninism is that Leninism not only restored Marxism, but also took a step forward, developing Marxism further under the new conditions of capitalism and of the class struggle of the proletariat." (Ex. 22, pp. 9–10) He declares that Russian Communists have gone beyond "the narrow national bounds of the Russian Revolution * * * to transfer the struggle to the international arena * * *" and "finally overthrow capitalism in their own country and to forge a new fighting weapon for the proletariat—the theory and tactics of the proletarian revolution—in order to facilitate the task of overthrowing capitalism for the proletarians of all countries". (Ex. 22, pp. 17 and 18.) Stalin quotes Lenin that the victorious proletariat, wherever established, should do "the utmost possible in one country for the development, support and awaking of the revolution in all countries". (Ex. 22, p. 46) Just as after the success of the October 1917 revolution in Russia, it was their objective "to consolidate the dictatorship of the proletariat in one country, using it as a base for the overthrow of imperialism in all countries." (Ex. 22, p. 91). Stalin stated that "capitalism has evolved into imperialism, and imperialism is a world system of financial enslavement and colonial oppression of the vast majority of the population of the earth by a handful of 'advanced' countries"; a system which he believed "as a whole is already ripe for revolution"; and since the "separate national fronts have become links in a single chain called the world front of imperialism" they "must be opposed by a common front of the revolutionary movement in all countries". (Ex. 22, pp. 35–36).

Stalin, like Lenin, condemned the so-called "opportunists" of the Second International (1899) who sought to bring about reforms through parliamentary action using that as the method to accomplish their purposes. Lenin and Stalin believed in the doctrine of the Third International (1919), that a proletarian revolution employing force was the way to power. Stalin wrote "Does not the history of the revolutionary movement show that the parliamentary struggle is only a school for and an aid in organizing the extra-parliamentary struggle of the proletariat, that under capitalism the fundamental problems of the working-class movement are solved by force, by the direct struggle of the proletarian masses, their general strike, their insurrection?" (Ex. 22 at p. 24). And, "The dictatorship of the proletariat cannot arise as the result of the peaceful development of bourgeois society and of bourgeois democracy; it can arise only as the result of the smashing of the bourgeois state machine, the bourgeois army, the bourgeois bureaucratic machine, the bourgeois police" (Ex. 22, p. 54). It would seem that force and violence would be needed to smash an army or the police.

In his "Foundations of Leninism" (Ex. 22) Stalin shows that the dictatorship of the proletariat will become "the foundation of the proletarian state power", and that "This new form of organization of the proletariats is the Soviets". "The Soviet power is the amalgamation and formation of the local Soviets into one common state organization, into the state organization of the proletariat as the vanguard of the oppressed and exploited masses and as the ruling class—their amalgamation into the republic of Soviets". (Ex. 22, p. 58). "The republic of Soviets is thus the political form, so long sought and finally discovered, within the framework of which the economic emancipation of the proletariat, the complete victory of socialism, is to be accomplished". (Ex. 22, p. 60).

The "Problems of Leninism" (Ex. 23) is a restatement of the principles of Leninism, with some of Stalin's arguments to show that nothing less than a violent revolution will overthrow the capitalist bourgeois governments and establish the dictatorship of the proletariat. The dictatorship of the proleteriat is to be the achieved result of the revolution.

The proletariat dictatorship would be controlled by the Communist Party as described in detail in Lenin's "Left Wing Communism" (Ex. 21 at p. 31) in which he stated:—

"The correlation, leaders—party—class—masses, as well as the relation of the dictatorship of the proletariat and its party to the trade unions, now present themselves concretely in Russia in the following form: the dictatorship is exercised by the proletariat, organized in the Soviets; the proletariat is led by the Communist Party (Bolsheviks), which, according to the data of the last Party Congress (April 1920) has a membership of 611,000. * * * The Party, which holds annual congresses (the last on the basis of one delegate for each 1000 members) is directed by a Central Committee of nineteen elected at the Congress, while the current work in Moscow has to be carried on by still smaller bodies, viz. the so-called 'Orgburo' (Organization Bureau) and 'Politburo' (Political Bureau), which are elected at plenary meetings of the Central Committee, five members of the Central Committee to each bureau. This, then, looks like a real 'oligarchy'. Not a single important political or organizational question is decided by any state institution in our republic, without the guiding instructions of the Central Committee of the Party."

"In its work, the Party relies directly on the trade unions * * * which are formally non-party. Actually, all the directing bodies of the vast majority of the unions, and primarily, of course, of the all-Russian general trade union centre or bureau (the All-Russian Central Trade Union Council) consist of Communists and carry out all the instructions of the Party. Thus, on the whole, we have a formally non-Communist, flexible and relatively wide and very powerful proletarian apparatus, by means of which the Party is closely linked up with the class and with the masses, and by means of which, under the leadership of the Party, the dictatorship of the class is effected. Without close contact with the trade unions, without their hearty support and self-sacrificing work, not only in economic but also in military affairs, it would, of course, have been impossible for us to govern the country and to maintain the dictatorship for two months, let alone two years. * * *" (Ex. 22, p. 32)

"Then, of course, all the work of the Party is carried on through the Soviets, which embrace the toiling masses irrespective of occupation. The * * * (county) * * * congresses of Soviets are democratic institutions the like of which even the best of the democratic republics of the bourgeois world has never known; and through these congresses (whose proceedings the Party endeavors to follow with the closest attention) as well as by constantly appointing class-conscious workers to all sorts of posts in the rural districts, the role of the proletariat as leader of the peasantry is exercised, the dictatorship of the urban proletariat is realized, and a systematic struggle against the rich, bourgeois, exploiting, and profiteering peasantry is waged." (Ex. 22, p. 33).

Stalin in his "Problems of Leninism" (Ex. 23) also describes how the Soviet system operates under the control of the Communist Party. He says:—

"Lastly, there is the Party of the proletariat, its vanguard. The Party's strength lies in the fact that it draws into its ranks all the best elements of the proletariat from all the mass organizations of the proletariat. Its function is to combine the work of all the mass organizations of the proletariat, without exception, and to guide their activities towards a single goal, that of emancipation of the proletariat. And it is absolutely essential to unite and guide them towards one goal, for otherwise the unity of the struggle of the proletariat and the leadership of the proletarian masses in their fight for power and for the building of socialism is impossible. Only the vanguard of the proletariat, its Party, is capable of combining and directing the work of the mass organizations of the proletariat. Only the Party of the proletariat, only the Party of the Communists, is capable of fulfilling this role of chief leader in the system of the dictatorship of the proletariat. (pp. 31–32)

* * * * * *

"Without the Party as the main leading force, a dictatorship of the proletariat at all durable and firm is impossible * * *

"* * * The Party realizes the dictatorship of the proletariat. It does so,

however, not directly, but with the help of the trade unions and through the soviets and their ramifications. Without these 'belts' anything like a firm dictatorship would be impossible. (pp. 33–34)"

"Here in the Soviet Union, in the land of the dictatorship of the proletariat, the fact that not a single important political or organizational question is decided by our Soviet and other mass organizations without directions from the Party must be regarded as the highest expression of the leading role of the Party. * * *" (p. 34)

Thus the Communist Party in a capitalist country is designed (1) to be the instrument of revolution in the violent overthrow of the bourgeois government, (2) the instrument of control in the dictatorship of the proletariat which is to follow the revolution, and (3) the all permeating authority in the establishment and functioning of the Soviet organizations to be united in a Soviet Union. Even though the Communist Party may be a very minor group when considered as a political party in a national election, their members constitute a well organized group subject to iron discipline, taking their party line from abroad, with a program for the violent overthrow of so-called capitalist forms of government at the opportune moment.

One of the most important documents in the proof offered in the Harisiades deportation proceeding was the "Program" of the Communist International, adopted at its international convention in 1928 (Ex. 5A).[13] It was to apply to all "sections" of the Party including that in the United States. "Sections" of the Communist International were the same as national communist parties, such as the Communist Party of the U.S.A. For nations such as the United States where a "highly centralized production" exists, "the fundamental political demand of the program is direct transition to the dictatorship of the proletariat". (p. 54) That this transition is to be accomplished by a proletariat revolution using force and violence is clear from the writings of Lenin and Stalin. There are, however, parts of the world where production is not so highly developed and the proletariat not so numerous proportionally, where the "peasants" are in greater numbers; and some parts of the world are only in a so-called colonial state of development. But the Program is intended for a world wide revolution and so the Program explains how these colonial and semi-colonial and dependent countries will also be drawn into "the growing Federation of Soviet Republics". (pp. 55–58).

The Programme of the Communist International (published in 1929) (Ex. 5A) advocates disloyalty to the Party member's own "bourgeois imperialistic government", and, in the event of a conflict with the U.S.S.R., a civil war against the "imperialist government" by Party members to aid the U.S.S.R. The following quotations from the Programme contain explicit instructions in that regard:—

"Being the land of the dictatorship of the proletariat and of Socialist construction, the land of great working class achievements, of the union of the workers with the peasants and of a new culture marching under the banner of Marxism— the U.S.S.R. inevitably becomes the base of the world movement of all oppressed classes, the centre of international revolution, the greatest factor in world history. In the U.S.S.R., the world proletariat for the first time acquires a country that is really its own, and for the colonial movements the U.S.S.R. becomes a powerful centre of attraction. (p. 63)

* * * * * *

"In view of the fact that the U.S.S.R. is the only fatherland of the international proletariat, the principal bulwark of its achievements and the most important factor for its international emancipation, the international proletariat must on its part facilitate the success of the work of Socialist construction in the U.S.S.R. and defend her against the attacks of the capitalist powers by all the means in its power.

" 'The world political situation has made the dictatorship of the proletariat an immediate issue, and all the events of world

13. See Kjar v. Doak, 7 Cir., 1932, 61 F. 2d 566; In re Saderquist, D.C., 11 F. Supp. 525, affirmed Sorquist v. Ward, D. C., 83 F.2d 890.

politics are inevitably concentrating around one central point, namely, the struggle of the world bourgeoisie against the Soviet Russian Republic, which must inevitably group around itself the Soviet movements of the advanced workers of all countries on the one hand, and all the national liberation movements of the colonial and oppressed nationalities on the other.' (Lenin).

"In the event of the imperialist States declaring war upon and attacking the U.S.S.R., the international proletariat must retaliate by organizing bold and determined mass action and struggling for the overthrow of the imperialist governments with the slogan of: Dictatorship of the proletariat and alliance with the U.S.S.R. (page 65)

&ast; &ast; &ast; &ast; &ast; &ast;

"The successful struggle of the Communist International for the dictatorship of the proletariat presupposes the existence in every country of a compact Communist Party, hardened in the struggle, disciplined, centralized, and closely linked up with the masses. (page 75)

&ast; &ast; &ast; &ast; &ast; &ast;

"The Communist Parties in *imperialist countries,* while supporting the struggle proceeding in the colonies, must carry on a campaign in their own respective countries for the withdrawal of imperialist troops, conduct propaganda in the army and navy in defence of the oppressed countries fighting for their liberation, mobilize the masses to refuse to transport troops and munitions and, in connection with this, to organize strikes and other forms of mass protest, etc.

"The Communist International must devote itself especially to systematic preparation for the struggle against the danger of *imperialist wars.* Ruthless exposure of social chauvinism, of social imperialism and of pacifist phrasemongering intended to camouflage the imperialist plans of the bourgeoisie; propaganda in favor of the principal slogans of the Communist International; everyday organizational work in connection with this, in the course of which work legal methods must unfailingly be combined with illegal methods; organized

work in the army and navy—such must be the activity of the Communist Parties in this connection. The fundamental slogans of the Communist International in this connection must be the following: Convert imperialist war into civil war; defeat the 'home' imperialist government; defend the U.S.S.R. and the colonies by every possible means in the event of imperialist war against them. It is the bounden duty of all Sections of the Communist International, and of every one of its members, to carry on propaganda for these slogans, to expose the 'socialistic' sophisms and the 'socialist' camouflage of the League of Nations and constantly to keep to the front the experiences of the war of 1914–1918. (p. 83)"

[This same Communist doctrine of the defense of the Soviet Union against the "imperialists" and the tactics to be pursued in the event that such a war is imminent or actually underway, is set forth in great detail in the Resolution of the Sixth World Congress of the Communist International (1929) in relation to "The Struggle against imperialist war and the Task of the Communists". (Ex. 27, pages 29 to 33) That part of the resolution relating to "The Proletariats' Attitude Towards Armies in Imperialist States" describing the means to be employed to destroy discipline, "mobilize them for the fight against the officers and the bourgeois" and "disintegrate" the armies is found at pages 40 to 41.]

The Programme (Ex. 5A) also sets forth a "line of tactics" to be followed in carrying through an armed insurrection within the member's imperialistic government.

"In determining its line of *tactics,* each Communist Party must take into account the concrete internal and external situation, the correlation of class forces, the degree of stability and strength of the bourgeoisie, the degree of preparedness of the proletariat, the position taken up by the various intermediary strata in its country etc. The Party determines its slogans and methods of struggle in accordance with these circumstances, with the view to organizing and mobilizing the masses on the broadest possible scale and on the highest possible level of this struggle.

"When a revolutionary situation is developing, the Party advances certain transitional slogans and partial demands corresponding to the concrete situation; but these demands and slogans must be bent to the revolutionary aim of capturing power and of overthrowing bourgeois capitalist society. The Party must neither stand aloof from the daily needs and struggles of the working class nor confine its activities exclusively to them. The task of the Party is to utilize these minor everyday needs as a *starting* point from which to lead the working class to the *revolutionary struggle* for power.

"When the revolutionary tide is rising, when the ruling classes are disorganized, the masses are in a state of revolutionary ferment, the intermediary strata are inclining towards the proletariat and the masses are ready for action and for sacrifice, the Party of the proletariat is confronted with the task of leading the masses to a direct attack upon the bourgeois State. This it does by carrying on propaganda in favor of increasingly radical transitional slogans (for Soviets, workers' control of industry, for peasant committees for the seizure of the big landed properties, for disarming the bourgeoisie and arming the proletariat, etc.) and by organizing mass action, upon which all Branches of Party agitation and propaganda, including parliamentary activity, must be concentrated. This mass action includes: a combination of strikes and demonstrations; a combination of strikes and armed demonstrations and finally, the general strike cojointly with armed insurrection against the state power of the bourgeoisie. The latter form of struggle, which is the supreme form, must be conducted according to the rules of war; it presupposes a plan of campaign, offensive fighting operations and unbounded devotion and heroism on the part of the proletariat. An absolutely essential condition precedent for this form of action is the organization of the broad masses into militant units, which, by their very form, embrace and set into action the largest possible numbers of toilers' (Councils of Workers' Deputies, Soldiers' Councils, etc.), and intensi-

fied revolutionary work in the army and the navy." (pages 79-80)

In line with that part of the Programme of the Communist International (quoted above from pages 63, 65, 75, 79, 80 and 83 of Ex. 5A) the Thesis of the Thirteenth Plenum of the Executive Committee of the Communist International (as printed in the "Communist", December 1933) (Ex. 11), states:—

"In fighting *against war*, the Communists must prepare even now for the transformation of the imperialist war into civil war, concentrate their forces in each country, at the *vital parts of the war machine* of imperialism.

"In addition to increased agitation, the Communist Parties must by all means in their power ensure the practical organization of *mass action* (increasing the work among the railwaymen, seamen and harbor workers, preventing the shipping of arms and troops, hindering the execution of orders for belligerent countries, organizing demonstrations against military maneuvers, etc.) and must *intensify political educational work in the army and in the navy*.

"The Thirteenth Plenum of the E.C.C.I. calls upon all the workers and the toilers of the world self-sacrificingly to defend the U.S.S.R. against the counter-revolutionary conspiracy of the imperialists, and to defend the Chinese revolution and its Soviet power from imperialist intervention." (p. 140)

As to preparation for the contest, the Thirteenth Plenum (Ex. 11) gave this advice:—

"The Thirteenth Plenum of the E.C.C.I. sets before all Communist Parties as most important tasks the carrying out of regular and constant check-ups on the strengthening of their ranks, of preparing to go underground, of tightening up the discipline and fighting fitness of every Party organization and of every member of the Party.

"The whole situation demands that the Communist Parties prepare in good time cadres for underground work, that they seriously tackle the question of combatting provocateurs, that they combine the meth-

ods of strict secrecy with securing the schematic structure and work of the underground organization.

"Only the concentration of all the efforts of the Party organizations on forming underground factory nuclei and intensifying the work of the Communist fractions in all of the mass organizations can ensure contacts with the masses and also the maximum of secrecy and efficiency.

"In carrying out these tasks, the Communists must utilize all legal possibilities to develop mass work, and to link up legal and illegal work."

In the May 1934 issue of the "Communist" (the Monthly Organ of the Communist Party of the U.S.A.) there is an article (Ex. 10) on "The Eighth Convention of Our Party" (The Communist Party of the U.S.A.) from which the following is quoted:—

"In December of last year, the Thirteenth Plenum of the E.C.C.I. declared that the general crisis of world capitalism had developed to a phase at which the objective conditions for a revolutionary crisis were fast maturing.

"In endorsing the E.C.C.I. Thesis, the Eighth Convention of our Party was guided by the recognition that the acute problem, the task underlying all tasks, which confronts it today is the development of the subjective factors for the revolutionary situation. For, the downfall of capitalism does not come about through automatic collapse; it is brought about through revolutionary overthrow by the proletariat at the culminating point of its struggle. The revolution is the achievement of the revolutionary class. By recognizing the development of the objective conditions favorable for a revolutionary crisis and by acting upon them, systematically, decisively, with a revolutionary will, the proletariat speeds the moment of capitalism's downfall. Concretely then, the Party's task is the preparation of the working class, through day-to-day struggle, for the practical work of revolution, for its historic role of assuming dictatorship." (p. 427)

The Seventh World Congress of the Communist International was held in Moscow in July and August 1935. A number of "Resolutions" were adopted (Ex. 47). A resolution based on a report of Georgi Dimitroff and adopted August 20, 1935 dealt with "The Offensive of Fascisms and the Task of the Communist International in the Fight for the Unity of the Working Class against Fascism". A subdivision of that resolution discussed the strengthening of the Communist Parties and a united front for the working class. It stated:—

"The Congress emphasizes with particular stress that only the further all-round consolidation of the Communist Parties themselves, the development of their initiative, the carry-out of a policy based on Marxist-Leninist principles, and the application of correct flexible tactics, which take into account the concrete situation and the alignment of class forces, can ensure the mobilization of the widest masses of toilers for the united struggle against fascism, against capitalism. (p. 36)

\*     \*     \*     \*     \*     \*

"The struggle for the establishment of the united front, the unity of action of the working class, gives rise to the necessity that the Social-Democratic workers be convinced by object lessons of the correctness of the Communist policy and the incorrectness of the reformist policy, and charges every Communist Party to wage an irreconcilable struggle against any tendency to gloss over the differences in principles between Communism and reformism, against weakening the criticism of Social-Democracy as the ideology and practice of class collaboration with the bourgeoisie, against the illusion that it is possible to bring about socialism by peaceful, legal methods, against any reliance on automatism or spontaneity, whether in the liquidation of fascism or in the realization of the united front, against belittling the role of the Party and against the slightest vacillation at the moment of decisive action. (p. 37)

"Holding that the interests of the class struggle of the proletariat and the success of the proletarian revolution make it imperative that a single mass political party of the working class exist in every country, the Congress sets the Communist Par-

ties the task of taking the initiative in bringing about this unity, relying on the growing desire of the workers to unite the Social-Democratic Parties or individual organizations with the Communist Parties. At the same time it must be explained to the workers without fail that such unity is possible only under certain conditions; under the condition of complete independence from the bourgeoisie and the complete severance of the bloc between Social-Democracy and the bourgeoisie, under the condition that unity of action be first brought about, that the necessity of the revolutionary overthrow of the rule of the bourgeoise and the establishment of the dictatorship of the proletariat in the form of Soviets be recognized, that support of one's own bourgeoisie in imperialist war be rejected, and that the party be constructed on the basis of democratic centralism which ensures unity of will and action and has been tested by the experience of the Russian Bolsheviks. (p. 37)

\* \* \* \* \* \*

"The establishment of the united front of the working class is the decisive link in the preparation of the toilers for the forthcoming great battles of the second round of proletarian revolution. Only the welding of the proletariat into a single mass political army will ensure its victory in the struggle against fascism and the power of capital, for the dictatorship of the proletariat and the power of the Soviets.

" 'The victory of revolution never comes by itself. It has to be prepared for and won. And only a strong proletarian revolutionary party can prepare for and win victory.' (Stalin) (p. 39)"

The Communist Party member in every country was bound to follow the program of the Communist International during the period of Harisiades membership. The 1930 membership book (Ex. 18), which a member received when he joined the Party, carries the heading:—"Communist Party of the U. S. A. (Section of the Communist International)". It bears the "Signature of District Organizer and Party Seal". Around the outer part of the seal are the words:— "Communist Party of the U.S.A.: The Communist International". The membership book contains "Extracts from the Statutes of the Communist Party" in relation to "Membership", "The Structure of the Party", "The Party Nucleus", "Party Discipline", "Party Dues". It contains also under the heading "What is the Communist Party", a paragraph from the program of the Communist International and a paragraph from Lenin. Under the heading "On Discipline" two paragraphs are quoted from Lenin, as follows:—

"He who weakens, no matter how little, the iron discipline of the Party of the proletariat (especially during the period of dictatorship), effectually helps the bourgeoisie against the proletariat. (Lenin)

"The Party as the best training school for working class leaders, is the only organization competent, in virtue of its experience and authority to centralize the leadership of the proletarian struggle, and thus to transform all non-Party working class organizations into accessory organs and connecting belts linking up the Party with the working class as a whole. (Lenin)"

The membership books' quotations from the "Statutes" contain the following:—

"§ 3—Membership

"1. A member of the Party can be every person from the age of eighteen up who accepts the program and statutes of the Communist International and the Communist Party of the U.S.A., who becomes a member of a basic organization of the Party, who is active in this organization, who subordinates himself to all decisions of the Comintern and of the Party, and regularly pays his membership dues."

"§ 12—Party Discipline[14]

"1. The strictest discipline is the most solemn duty of all Party members and all

14. On the subject of Party discipline, two paragraphs from the "Program of the Communist International 1928" (Ex. 5A, p. 84) are pertinent and are quoted as follows:—

"In order that revolutionary work and revolutionary action may be coordinated and in order that these activities may be guided most successfully, the international proletariat must be bound by internation-

Party organizations. The decisions of the CI and the Party Convention, of the CC and of all leading committees of the Party, must be promptly carried out. Discussion of questions over which there have been differences must not continue after the decision has been made."

The membership book (Ex. 18) also answers the question "What is the Communist Party" as follows:—

"The Party is the vanguard of the working class and consists of the best, most class conscious, most active, the most courageous members of that class. It incorporates the whole body of experience of the proletarian struggle, basing itself upon the revolutionary theory of Marxism and representing the general and lasting interests of the whole of the working class, the Party personifies the unity of proletarian principles, of proletarian will and of proletarian revolutionary action. (From the program of the Communist International).

"We are the Party of the working class. Consequently, nearly the whole of that class (in time of war and civil war, the whole of that class) should work under the guidance of our Party, should create the closest contacts with our Party. (Lenin)"

al class discipline, for which, first of all, it is most important to have the strictest international discipline in the Communist ranks.

"This international Communist discipline must find expression in the subordination of the partial and local interests of the movement to its general and lasting interests and in the strict fulfillment, by all members, of the decisions passed by the leading bodies of the Communist International."

15. The following paragraphs of the C. I. Constitution describe its structure and ruling groups:—

"1. The Communist International—the International Workers' Association—is a union of Communist Parties in various countries; it is a World Communist Party."

"2. Each of the various Parties affiliated to the Communist International is called the Communist Party of ...... [name of country] (Section of the Communist International). In any given country there can be only one Communist

Section 4—"The Structure of the Party"—contains the following paragraphs showing the concentration of power in The Executive Committee of the Communist International and the Central Committee of the Party:—

"c) Acceptance and carrying out of the decisions of the higher Party committees by the lower, strict Party discipline, and immediate and exact applications of the decisions of the Executive Committee of the Communist International and of the Central Committee of the Party.

\* \* \* \* \* \*

"e) The discussion on basic Party questions or general Party lines can be carried on by the members only until the Central Committee has decided them. After a decision has been adopted at the congress of the Comintern, the Party convention, or by the leading Party committee, it must be carried out unconditionally, even if some of the members or some of the local organizations are not in agreement with the decision."

The structure of the Communist International and the great power conferred on its Executive Committee Presidium, Political Secretariat are clearly set forth in its Constitution and Rules (Ex. 5A).[15]

Party affiliated to the Communist International and representing its Section in that country.

\* \* \* \* \* \*

"8. The supreme body of the Communist International is the World Congress of representatives of all Parties (Sections) and organizations affiliated to the Communist International.

"The World Congress discusses and decides programme, tactical and organizational questions connected with the activities of the Communist International and of its various Sections. Power to alter the programme and rules of the Communist International lies exclusively with the World Congress of the Communist International.

\* \* \* \* \* \*

"10. The World Congress elects the Executive Committee of the Communist International (E.C.C.I.), and the International Control Commission (I.C.C.)."

"11. The headquarters of the Executive Committee is decided on by the World Congress."

"12. The leading body of the Com-

The strict supervision and absolute control exercised by the Communist International over its "Sections" (National Parties), the National Party committees and the membership in various countries, is shown by the provisions of many of the

munist International in the period between Congresses is the Executive Committee, which gives instructions to all the Sections of the Communist International and controls their activity.

"The E.C.C.I. publishes the Central Organ of the Communist International, in not less than four languages."

"13. The decisions of the E.C.C.I. are obligatory for all the Sections of the Communist International and must be promptly carried out. The Sections have the right to appeal against decisions of the E.C.C.I. to the World Congress, but must continue to carry out such decisions pending the decision of the World Congress."

"14. The Central Committees of the various Sections of the Communist International are responsible to their respective Party Congresses and to the E.C.C.I. The latter has the right to annul or amend decisions of Party Congresses and of Central Committees of Parties and also to make decisions which are obligatory for them. (Cf. Par. 13.)"

"15. The E.C.C.I. has the right to expel from the Communist International, entire Sections, groups and individual members who violate the programme and rules of the Communist International or the decisions of the World Congress and of the E.C.C.I. Persons and bodies expelled have the right of appeal to the World Congress."

"16. The programmes of the various Sections of the Communist International must be endorsed by the E.C.C.I. In the event of the E.C.C.I. refusing to endorse a programme, the Section concerned has the right to appeal to the World Congress of the Communist International."

"17. The leading organs of the press of the various Sections of the Communist International must publish all the decisions and official documents of the E.C. C.I. These decisions must, as far as possible, be published also in the other organs of the Party press.

\*      \*      \*      \*      \*      \*

"19. The E.C.C.I. elects a Presidium responsible to the E.C.C.I., which acts as the permanent body carrying out all the business of the E.C.C.I. in the interval between the meetings of the latter."

"20. The E.C.C.I. and its Presidium have the right to establish Permanent Bureaus (Western European, South American, Eastern and other Bureaus of the E.C.C.I.), for the purpose of establishing closer contact with the various Sections of the Communist International and in order to be better able to guide their work.

"Note: The scope of the activities of the permanent bureaus of the E.C.C.I. shall be determined by the E.C.C.I. or by its Presidium. The Sections of the Communist International which come within the scope of activities of the permanent bureaus of the E.C.C.I. must be informed of the powers conferred on these bureaus."

"21. The Sections must carry out the instructions of the permanent bureaus of the E.C.C.I. Sections may appeal against the instructions of the permanent bureaus to the E.C.C.I. or to its Presidium, but must continue to carry out such instructions pending the decision of the E. C.C.I. or of its Presidium."

"22. The E.C.C.I. and its Presidium have the right to send their representatives to the various Sections of the Communist International. Such representatives receive their instructions from the E.C.C.I. or from its Presidium, and are responsible to them for their activities. Representatives of the E.C.C.I. have the right to participate in meetings of the central Party bodies as well as of the local organizations of the Sections to which they are sent. Representatives of the E.C.C.I. must carry out their commission in close contact with the Central Committee of the Section to which they are sent. They may, however, speak in opposition to the Central Committee of the given Section, at Congresses and Conferences of that Section, if the line of the Central Committee in question diverges from the instructions of the E.C.C.I. Representatives of the E.C.C.I. are especially obliged to supervise the carrying out of the decisions of the World Congresses and of the Executive Committee of the Communist International.

"The E.C.C.I. and its Presidium also have the right to send instructors to the various Sections of the Communist International. The Powers and duties of instructors are determined by the E.C.C.I., to whom the instructors are responsible in their work."

"23. Meetings of the E.C.C.I. must take place not less than once every six months. A quorum consists of not less than one-half of the membership of the E.C.C.I."

"24. Meetings of the Presidium of the

paragraphs of the Constitution of the Communist International quoted in the footnote.[16] See also footnote 3 of Chief Justice Stone's dissenting opinion in the Schneiderman case.

The right of appeal to the World Congress from any decision of the Executive Committee was of little value. Although the World Congresses were supposed to be held every two years (§ 8), there was a lapse of seven years between the Sixth World Congress held in 1928 (Ex. 27) and the Seventh World Congress held in 1935. (Ex. 47) The executive Committee was the ruling body between World Congresses.

Because the Communist Party of the U. S. A. was a "Section" of the Communist International during the period 1925–1939

(the comintern was not dissolved until 1943) [17] the programs and resolutions adopted by the Communist International at its Congresses and by its Executive Committee between sessions of the Congress, advocating the overthrow of capitalistic governments by force and violence, are relevant to the issues in this proceeding. As shown above, the Eighth Convention of the Communist Party of the U. S. A. held in April 1934 (Ex. 10) specifically endorsed the Theses of the Thirteenth Plenum of the E.C.C.I. (Ex. 11) issued December 1933. The Manifesto of the Eighth Convention of the Communist Party, U. S. A. (Ex. 12) states:—

"The conditions in the United States confirm the statement of the Thesis of the XIII Plenum of the E. C. C. I.,[18] that 'the

E.C.C.I. must take place not less than once a fortnight. A quorum consists of not less than one-half of the membership of the Presidium."

"25. The Presidium elects the Political Secretariat, which is empowered to take decisions, and which also prepares questions for the meetings of the E.C.C.I. and of its Presidium, and acts as their executant body."

16. "29. The Central Committees of Sections affiliated to the Communist International and the Central Committees of affiliated sympathizing organizations must send to the E. C. C. I. the Minutes of their meetings and reports of their work."

"30. Resignation from office by individual members or groups of members of Central Committees of the various Sections are regarded as disruptive of the Communist movement. Leading posts in the Party do not belong to the occupant of that post, but to the Communist International as a whole. Elected members of the Central Leading bodies of the various Sections may resign before their time of office expires only with the consent of the E. C. C. I. Resignations accepted by Central Committees of Sections without the consent of the E. C. C. I. are invalid."

"31. The Sections affiliated to the Communist International must maintain close organizational and informational contact with each other, arrange for mutual representation of each other's conferences and congresses, and with the consent of the E. C. C. I., exchange leading comrades. This applies particularly to the

Sections in imperialist countries and their colonies, and to the Sections in countries adjacent to each other."

"34. Congresses of the various Sections, ordinary and special, can be convened only with the consent of the E. C. C. I.

"In the event of a Section failing to convene a Party Congress prior to the convening of a World Congress, that Section before electing delegates to the World Congress, must convene a Party conference, or Plenum of its Central Committee, for the purpose of preparing the questions for the World Congress."

"36. The Communist Parties must be prepared for transition to illegal conditions. The E. C. C. I. must render the Parties concerned assistance in their preparations for transition to illegal conditions."

"37. Individual members of Sections of the Communist International may pass from one country to another only with the consent of the Central Committee of the Section of which they are members.

"Communists changing their domicile must join the Section in the country of their new domicile. Communists leaving their country without the consent of the Central Committee of their Section, must not be accepted into other Sections of the Communist International."

17. See footnote 3 to Chief Justice Stone's dissenting opinion in the Schneiderman case, supra.

18. Exhibit 11, hereinabove discussed.

international situation bears all the features of the condition of a new world war.' 'The greatest historical task of international communism is to mobilize the broad masses against war, and, even before the war has begun, thereby hasten the doom of capitalism. Only a Bolshevik struggle before the outbreak of war for the triumph of revolution can assure the victory of revolution that breaks out in connection with war.'

"This declaration of the E. C. C. I. applies with full force to the task of the American Communists."

The declaration of the E. C. C. I. meant that if the government of the United States of America became involved in a war, the American Communists' task was to turn it into a civil war by starting an armed insurrection against our government, at a time when its fortunes might be at their lowest and the opportunity for insurrection appeared propitious.

However, Communism was confronted with the growth of Fascism in certain European countries and therefore sought a "united front" with the Social-Democratic groups in capitalistic countries. At the Seventh Congress of the Communist International (July-August 1935) the resolutions adopted (Ex. 47) advise the Executive Committee to seek a united front with the Social-Democratic organizations, and "as a rule, to avoid direct intervention in the internal organizational matters of the Communist Parties" (Sections), and to assist in training "cadres of genuinely Bolshevik leaders in the Communists Parties", avoiding the "mechanical application of the experience of one country to another country" (pages 18–19). Nevertheless, one of the resolutions contained a warning "against any tendency to gloss over the differences in principle between Communism and reformism" and "against the illusion that it is possible to bring about socialism by peaceful, legal methods, against any reliance on automatism or spontaneity * * *". (p. 37) In the resolution dealing with "the tasks of the

Communist International to meet the "Preparations of the Imperialists for a new World war", the members were reminded that "On the basis of the teachings of Marx—Engels—Lenin—Stalin on war, the Sixth World Congress (held July-August 1928) [19] of the Communist International concretely formulated the tasks of the Communist Parties and the revolutionary proletariat in the struggle against imperialist war". (p. 44) The resolution further states:—"Should a new imperialist world war break out, despite all efforts of the working class to prevent it, the Communists will strive to lead the opponents of war, organized in the struggle for peace, to the struggle for the transformation of the imperialist war into civil war against the fascist instigators of war, against the bourgeoisie, for the overthrow of capitalism". (p. 47) And, "If the commencement of a counter-revolutionary war forces the Soviet Union to set the Workers' and Peasants' Red Army in motion for the defense of socialism, the Communists will call upon all toilers to work, with all means at their disposal and at any price, for the victory of the Red Army over the armies of the imperialists". (p. 48).

The opening paragraph of the Resolutions adopted by the Ninth Convention of the Communist Party, U. S. A. (Ex. 41) held in June 1936 states:—"The Ninth National Convention of the C. P. U. S. A. declares that the analysis of the world situation given by the Seventh Congress of the Communist International has proven correct." [20]

It also states:—"The decisions of the World Congress have proven a powerful weapon in the struggle for the unity of the working class against fascism and war".

While conceding that there had been an improvement in business in this country, the resolution of the Ninth National Convention of the Communist Party, U. S. A., declares:—

"But the capitalist system cannot and will not get out of its state of general

---

19. See discussion of Exhibit 27, hereinabove.

20. The Resolutions of the Seventh Congress of the Communist International are Exhibit 47, hereinabove discussed.

crisis. Only the proletarian Socialist revolution, by overthrowing the rule of the capitalist class and establishing a Soviet government, will do away with the crisis and insecurity, will do away with the intolerable conditions of capitalist decline and deca. It will establish a socialist system of society as in the Soviet Union, where crises and unemployment are no longer known and where social security has become a reality and the well-being of all toilers is continually improving. (p. 9)

\* \* \* \* \* \*

"The Communist Party will continue with all energy, despite all obstacles, to work for the united front between the Communist and Socialist Parties. It will utilize all occasions to approach the National Committee of the Socialist Party for united action. And this the Communists will do 'without for a moment giving up their independent work in the sphere of Communist education, organization and mobilization of the masses'. The National Convention warns against all tendencies to slacken on this independent work—the most effective way of stimulating united action—as well as against all tendencies to mistake radical phrases for deeds. (p. 23)

\* \* \* \* \* \*

"These constitute the main tasks of the Party in the present period. It is the building of the united front of the working class and of the People's Front—the Farmer-Labor Party—as a coalition of the working class and its allies. By getting hold of these tasks we shall build the impreguable resistance of the masses against the offensive of reaction and will create the prerequisites for the next and higher stage of struggle—the overthrow of capitalism and the building of socialism through Soviet power. These are the great historic tasks confronting the Communist Party and every Communist in the United States. (p. 37)

\* \* \* \* \* \*

"While carrying on the daily practical and political tasks as outlined above, the Communists must systematically educate the masses to the Marxist-Leninist position on war as embodied in the thesis of the Sixth World Congress of the Communist International and in the resolution of its Seventh Congress. (p. 53)"

The General Secretary of the Communist Party, U. S. A., delivered a Report (Ex. 35) to the Ninth Convention in 1936, in preparation for the 1936 national elections. The report declared:—

"The Communist Party must use the opportunity of this election campaign to smash once and for all the superstition, which has been embodied in a maze of court decisions having the force of law, that our party is an advocate of force and violence, that it is subject to law (Federal immigration laws, state 'criminal syndicalism' laws) directed against such advocacy. The Communist Party is not a conspirative organization, it is an open revolutionary Party, continuing the traditions of 1776 and 1861; it is the only organization that is really entitled by its program and work to designate itself as 'sons and daughters of the American revolution'. Communists are not anarchists, not terrorists. The Communist Party is a legal party and defends its legality. Prohibition of advocacy of force and violence does not apply to the Communist Party; \* \* \* . (p. 42)

\* \* \* \* \* \*

"We are going into the 1936 election campaign to win the masses to the people's front against reaction, fascism, and war. Our program is directed to maintain peace, and to advance the economic interests and democratic rights of the workers, farmers, and impoverished middle classes.

"This is a fight for liberty for the masses of the people. We are the party of socialism, of the proletarian revolution, of Soviet power \* \* \* socialism will come out of life, out of the class struggle. Only by rousing and organizing millions of people in the fight for liberty can we bring these millions to the fight for socialism; only that Party which is the vanguard of millions in their first struggle will lead these millions to the final struggle of the socialist revolution. Our slogan is the slogan of Lenin: 'Through liberty to Socialism' (p. 42)".

If the Communist Party U.S.A. was to strive for a "united front" with other small political socialist groups it felt required to declare that it was not a "conspirative organization", favoring the use of force and violence to overthrow the government. Indeed, it professed to be "an open revolutionary group" like those who signed the Declaration of Independence in 1776, so that it could claim to be in essence a chapter of the Sons and Daughters of the American Revolution.

As Fascism grew more powerful in Europe, threatening both the democracies and the Soviets, the Communist parties changed their slogan from a "united front", a "democratic front" and put on the shelf their former demand for the overthrow of capitalistic governments by force and violence.

The Report of Earl Browder to the Tenth National Convention of the Communist Party of U.S.A., held in May 1938 (Ex. 39) called for a "democratic front" and stated that the Communist Party program could not be for a socialist reorganization of American society because it was not then "on the order of the day".

"Because the majority of the American people are not convinced of the necessity of this socialist reorganization, this program being accepted as yet only by a relatively small minority, and because today the main enemy is fascism, the Communist Party finds it necessary to dedicate all its forces to realizing the program of the democratic front, and building the organizations of the democratic front, as the only guarantee against the victory of reaction and fascism, which threatens to destroy democracy and all its past achievements, to destroy civilization itself.

"The program of the democratic front is not a socialist program. It is the minimum of those measures necessary, under capitalism, to preserve and extend democracy, all those things which have been the heart of the American tradition in the past, ever since the revolutionary foundation of the United States. The program of the democratic front is squarely based upon traditional Americanism." (p. 87)

Mr. Browder also presented a "new" party constitution to the Tenth National Convention of the Communist Party U.S. A., and stated:—

"This Convention is presented with a new and revised Party Constitution. We have been operating for over nine years with an 'unwritten constitution.'[21] Our Sixth Convention, early in 1929, had adopted a draft constitution, but because that was at the height of the factional disruption created by the renegade Lovestone, it received no serious consideration, never reached the Party, and was lost. We are now at a point in our development when it has become necessary to dispel all vagueness and uncertainty about the Party, its fundamental program, its structure, and its relation to our country and the world. That is the significance of the Constitution presented to you.

"There is nothing new in principle in the new Constitution. It is the codification of our existing organizational practice, and presents our fundamental program in the terms of modern America, and in the light of the Seventh World Congress of the International Communist movement.

"At our Ninth Convention we adopted a special resolution in refutation of all our enemies who wanted to outlaw our Party or isolate it with the charge that we are a conspiratorial party of violent overthrow of American democracy. Our enemies ignored our action, and continued and intensified their slanders against us. We

21. Exhibit 18, a membership book issued by the Central Committee of the Communist Party of the U.S.A. was issued to a member admitted to the Party in August 1930. The membership book contains "Extracts from the Statutes of the Communist Party of the U.S.A." If the Party did not have a "Constitution" in 1930 it did have "Statutes", which served the same purpose. Those statutes followed the Party line. Compare the "Statutes" quoted in Exhibit 18 with the Constitution of the Communist International (Ex. 5A, p. 88). The "Statutes" and "Constitution" of the Communist International meant the same thing. Compare the fly leaf of Exhibit 5 (published in 1936) with that of Exhibit 5A (published in 1929).

have, therefore, proposed to write our answer to the reactionaries into our Constitution, in such full and complete terms that even a capitalist newspaper editor cannot evade or distort it." (p. 79)

The constitution of the Communist Party U.S.A. adopted in May 1938 is Exhibit 4 in this case. Article II (Emblem) provides:—

"The emblem of the Party shall be the crossed hammer and sickle, representing the unity of worker and farmer, with a circular inscription having at the top 'Communist Party of the U.S.A.' and in the lower part 'Affiliated to the Communist International.'"

Article V (International Solidarity and Assessment) Section 1 provides:—"Every four months, all members of the Party shall pay an assessment equal to the average dues payment per month for the previous four months, for an International Solidarity Fund. This money shall be used by the National Committee exclusively to aid our brother Communist Parties in other countries suffering from fascist and military reaction."

Article VI (Rights and Duties of Members) Section 1 provides:—"The Communist Party of the U.S.A. upholds the democratic achievements of the American people. It opposes with all its power any clique, group, circle, faction or party which conspires or acts to subvert, undermine, weaken or overthrow any or all institutions of American democracy whereby the majority of the American people have obtained power to determine their own destiny in any degree. The Communist Party of the U.S.A., standing unqualified for the right of the majority to direct the destinies of our country, will fight with all its strength against any and every effort, whether it comes from abroad or from within, to impose upon our people the arbitrary will of any selfish minority group or party or clique or conspiracy."

Article X (Disciplinary Procedure) Section 5, provides:—"Party members found to be strikebreakers, degenerates, habitual drunkards, betrayers of Party confidence, provocateurs, advocates of terrorism and violence as a method of Party procedure, or members whose actions are detrimental to the Party and the working class, shall be summarily dismissed from positions of responsibility, expelled from the Party and exposed before the general public."

Article XI on "Affiliation", provides:— "The Communist Party of the U.S.A. is affiliated with its fraternal Communist Parties of other lands through the Communist International and participates in International Congresses, through its National Committee. Resolutions and decisions of International Congresses shall be considered and acted upon by the supreme authority of the Communist Party of the U.S.A., the National Convention, or between Conventions, by the National Committee."

The 1938 constitution of the Communist Party U.S.A. did not separate the Party from the Communist International, but on the contrary maintained is "affiliation" with that body. The Communist Party U.S.A. remained a "Section" of the International, under the latter's constitution, (Ex. 5A).

The historic events of 1939, the alignment of the U.S.S.R. with Fascist Germany in a Treaty or Pact, resulting in the immediate invasion and partitioning of Poland in September 1939, are too well known to require any discussion. Harisiades testified that he was dropped by the Communist Party U.S.A. in October 1939 pursuant to a policy which appears to have been designed to relieve the alien members from the risk of the impact of such statutes as § 137 of Title 8 U.S.C.A., under which deportation proceedings might be instituted against them. In June 1941 Germany invaded the U.S.S.R. In December 1941 Japan attacked the U. S. A. Thus the capitalistic countries and the Soviets became allies against the Fascist-Axis group. What happened after 1939 within the Communist Party U. S. A. is of slight relevancy. But the course it followed was along the party line, as the exigencies of the international situation required at the time. For that and other reasons, the documents published after October 1939 are entitled to little weight. Further, they

were published after the "critical period" in the case at bar, i. e. after Harisiades ceased to be a member of the Communist Party U. S. A. in October 1939. Schneiderman v. United States, supra, 320 U.S. at page 152, 63 S.Ct. at page 1349, 87 L.Ed. 1796 tells us that such documents are entitled to little weight.

The 1848 Manifesto of Marx and Engels (Ex. 19) is not an "ancient document" in any sense of the word. It has had a wide circulation, especially since the Third International (1919). Exhibit 19 (the Marx-Engels Manifesto) is from the "Eleventh Printing, April 1939, 100,000 copies". "The Manifesto" is listed by petitioner's counsel as one of the "classics" of the Marxism-Leninism social "science", "theory", philosophy"; and Lenin and Stalin frequently quoted from it. (Exs. 20, 21, 22, and 23). Lenin's and Stalin's books have been printed here in great quantities.[22] "The basic works of Marx, Engels, Lenin and Stalin" were declared by the Communist Party to be "as necessary to our daily life as the air we breathe" (Ex. 37 p. 68.) The present day Communists use the term "Marxism-Leninism", which would indicate that the revolutionary doctrine of the Manifesto is to them something still young and fresh.

The fundamental teachings of the Communist International are so clearly and repeatedly expressed in the books written by Lenin and Stalin and in the program, resolutions and theses of the Communist International and its Executive Committee, that they require no testimony of an "expert" to aid the Court in interpreting them. Therefore explanatory testimony of Harisiades and Schneiderman as to the meaning of certain passages in these documents is of little value, as against the clear import of what was written. The "iron discipline" binding the "Sections" such as the Communist Party U. S. A. and their members to the C. I. is not relaxed by any soft words of the late 1930s. What that discipline meant and how it could be exercised is evidenced by Stalin's 1929 speeches on the Communist Party U. S. A.

during the Lovestone factional dispute. (Ex. 46).

█ The record shows that the principal exhibits in this case, including the Resolutions and Programs of the World Congresses were circulated by the Communist Party U. S. A. The source of publication and sale, as printed on many of the exhibits, proves that point. In fact circulation and distribution of many of these documents by the Communist Party U. S. A. is really not contested. The opinion of the Chief Inspector carefully notes and considers the proof in respect to the circulation and distribution of each important exhibit, immediately following his analysis and discussion of its contents. His conclusion and that of the Chief Examiner and Acting Commissioner, affirmed by the Board of Immigration Appeals, that during Harisiades membership in the Communist Party of the U. S. A., the Party taught and advocated the overthrow of the government of the U. S. A. by force and violence and circulated and distributed literature to that effect, has been established by more than a fair preponderance of the evidence in this case.

### Burden of Proof

█ As stated by Mr. Justice Douglas in the majority opinion in Bridges v. Wixon, 326 U.S. 135, at page 149, 65 S.Ct. 1443, at page 1450, 89 L.Ed. 2103: "In these habeas corpus proceedings we do not review the evidence beyond ascertaining that there is some evidence to support the deportation order" (citing United State ex rel. Vajtauer v. Commissioner, 273 U.S. 103, 106, 47 S.Ct. 302, 71 L.Ed. 560).

Chief Justice Stone in his dissenting opinion in Bridges v. Wixon stated 326 U. S. at page 167, 65 S.Ct. at page 1458: "And when the authority to deport the alien turns on a determination of fact by the Attorney General, the courts, as we have said, are without authority to disturb his finding if it has the support of evidence of any probative value."

In a deportation proceeding the burden of proof required is not as great as in a

---

22. Lenin's "State and Revolution" (copyrighted in this country in 1932) had a third printing of 100,000 copies in 1935.

denaturalization proceeding. U. S. ex rel. Potash v. District Director, 2 Cir., 169 F. 2d 747 at page 750. In the case at bar the Chief Examiner held that all the charges were established by "ample substantial evidence". In my opinion the charges on which the Board of Immigration Appeals held that Harisiades was deportable, were proved by more than a fair preponderance of the evidence.

### Constitutional Questions

Is § 137 of T. 8 U.S.C.A. as amended in June 1940, an "ex post facto law" as applied to the petitioner, Harisiades?

■ Petitioner's counsel argues that the June, 1940 amendment to the statute, T. 8 U.S.C.A. § 137, which declared deportable any alien who was at the time of entering the United State or *has been at any time thereafter* a member of an organization which believes in, advocates or teaches the overthrow by force or violence of the Government of the United States is an "ex post facto law," if applied to the petitioner, because his membership in the Communist Party in the United States ceased in October 1939 when, it is alleged, the Party formally dropped all alien members. An *ex post facto* law is one that makes an act committed before its passage criminal, although at the time the act was committed it was not criminal. Ex post facto laws are specifically forbidden by Art. I, § 9, of the United States Constitution. But a deportation proceeding is not a criminal proceeding. The retrospective features of a deportation statute do not fall under the ban of the ex post facto section of the Constitution. Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066; Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101; Bugajewitz v. Adams, 228 U.S. 585, 33 S.Ct. 607, 57 L.Ed. 978; Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549.

The June, 1940 amendment of the statute was for the specific purpose of overriding the Supreme Court's opinion in Kessler v. Strecker, 307 U.S. 22, 59 S.Ct. 694, 83 L. Ed. 1082, which held that *present* membership or affiliation in the proscribed organization was required at the time the warrant of arrest was issued and that past membership, even if assumed after the alien became a resident, was not sufficient. After the 1940 amendment, 54 Stat. 673, it "was no longer necessary that the alien be an affiliate or member at the time of the issuance of the warrant of arrest," as Mr. Justice Murphy noted in his concurring opinion in Bridges v. Wixon, supra. Circuit Judge Wilbur discussed the ex post facto argument in Bridges v. Wixon, 9 Cir., 144 F.2d 927, at page 936 as follows:—"It is claimed that the act of 1940 is an ex post facto law in that it permits deportation for conduct prior to the enactment of the amended law. The constitutional prohibition against ex post facto laws applied only to criminal proceedings. A proceeding for deportation is not a criminal proceeding and is not intended or designed to punish crime. * * *"

Does § 137 of Title 8, U.S.C.A. violate the First and Fifth Amendments of the U. S. Constitution?

■ Does a statute of Congress which directs that any alien who teaches and advocates, or is a member of an organization which teaches and advocates, the overthrow of the Government of the United States by force and violence, shall be deported, violate the First Amendment which guarantees freedom of speech and of press? We start with the holding that "Freedom of speech and of press is accorded aliens residing in this country. Bridges v. [State of] California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 [159 A.L.R. 1346]", as stated by Mr. Justice Douglas in Bridges v. Wixon, supra, 326 U.S. at page 148, 65 S.Ct. at page 1449:

In Skeffington v. Katzeff, 1 Cir., 1922, 277 F. 129, the appellate court held that there was substantial evidence in the record to sustain the finding of the Secretary of Labor that the Communist Party taught and advocated the overthrow of the government of the United States of America by force and violence. In connection with the power of Congress to enact a statute for the deportation of aliens who are members of an organization that teaches or advocates the overthrow of the government by force or violence the Court held,

277 F. at page 131:—"It is too well settled by the decisions of the Supreme Court of the United States to require any citation of authorities that an alien resident in the United States may be deported for any reason which Congress has determined will make his residence here inimical to the best interests of the government."

In Kjar v. Doak, 7 Cir., 1932, 61 F.2d 566, at page 570 the Court did not specifically consider the constitutionality of the statute but stated generally, Sparks, C. J., "Congress has the power to prescribe conditions upon which aliens may be admitted and permitted to remain in this country. Those conditions are binding upon the court, and we have no authority or discretion to disregard them."

Congress has defined by statute, in Title 18 U.S.Code Annotated, Chapter 115, "Treason" (§ 2381) and "Misprison of treason" (§ 2382), which apply only to those "owing allegiance to the United States"; also "Rebellion or insurrection" (§ 2383) and "Seditious conspiracy" (§ 2384), which apply to aliens as well as citizens; and finally "advocating overthrow of Government" (§ 2385) which applies to any person, citizen or alien. The latter statute (§ 2385) includes any one who organizes or attempts to organize a group to advocate the overthrow or destruction of our government; or who "becomes or is a member of, or affiliates with, any such" group "knowing the purposes thereof".

It would seem that if Congress can declare membership in such a group, with knowledge of its purpose, a crime, it may properly declare any such membership by an alien as sufficient grounds for deporting him.

The preamble of the Constitution states: —"WE THE PEOPLE of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this CONSTITUTION for the United States of America."

The constitution distributes the powers of the Government to its three branches— legislative, executive, and judicial.

Among the powers conferred on the Congress as the legislative branch, is the power "To establish a uniform Rule of Naturalization". Art. 1, § 8, cl. 4. Congress is also empowered: "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrection and repel Invasions". Art. 1, § 8, cl. 15.

Article V provides for amendments to the Constitution.

The first amendment states, among other things, that Congress shall make no law "abridging the freedom of speech, or of the press."

In Ex Parte Bridges, D.C.N.D.Cal.1943, 49 F.Supp. 292, Welsh, J., considered the constitutionality of Section 137 of Title 8, U.S.C.A., in the light of the constitutional provisions and upheld it as a valid exercise of Congressional power. He stated, 49 F.Supp. at page 300:—

"I do not consider it necessary to uphold the validity of the Act of Congress in this case upon the broad principle that Congress may, as an incident of sovereignty, expel resident aliens on any or no ground at all. For Congress undoubtedly may, within the bounds of constitutional limitations, enact legislation looking toward the expulsion of aliens whose course of conduct while residents of this country, has marked them with the possession of qualities which can reasonably be said to render their continued presence here undesirable in the interests of public welfare. By the Act of October 16, 1918, as amended in 1940, Congress has classified within the category of aliens whose presence it deems inimicable to the welfare of this country, those aliens who, through past participation by membership in or affiliation with subversive organizations, have indicated at least a one-time disposition of hostility toward or established form of government and a willingness to see it destroyed by force and violence. In subjecting such aliens to deportation, it cannot be said that Congress has acted capriciously. Although such aliens

may have discontinued their subversive affiliations, they nevertheless have manifested a spirit of disloyalty; they have shown a willingness to accept the hospitality and protection offered them by this country while participating in activities designed, not toward peaceable and constitutionally authorized changes in its government, but rather toward the eventual revolutionary and violent overthrow of the government whose protection they have enjoyed. The Congressional assumption that such aliens do not constitute desirable material for residents or citizens of this country is not arbitrary and unreasonable and consequently, it is not in excess of Congressional power to provide for their deportation. If the result is a curtailment of their freedom of speech while in this country, it is a curtailment consonant with the constitutional guarantees of the Bill of Rights.

\* \* \* \* \* \*

"Congressional power over the deportation of undesirable aliens is co-existent with guaranteed freedom of speech. Both should be so construed that the efficacy of neither is thereby destroyed. I see no cause for complaint that Congress has not confined itself to the deportation of alien members or affiliates of those subversive organizations only whose activities present a clear, serious or imminent danger of accomplishing the evil which the legislation is designed to prevent. Aliens who, by their associations, have evidenced belief in the forcible and violent overthrow of our Government, become none the more desirable material for residents or citizens of this country because their views do not embrace the conception of immediate revolution but are directed rather to forcible and violent overthrow of organized government at some indefinite future period when the opportune moment may present itself."

On appeal, Bridges v. Wixon, 9 Cir., 1944, 144 F.2d 927, at page 931, the appellate court quoted the following from the opinion of Mr. Justice Pitney in Zakonaite v. Wolf, 226 U.S. 272, 33 S.Ct. 31, 57 L.

Ed. 218:—"'It is entirely settled that the authority of Congress to prohibit aliens from coming within the United States, and to regulate their coming, includes authority to impose conditions upon the performance of which the continued liberty of the alien to reside within the bounds of this country may be made to depend; that a proceeding to enforce such regulations is not a criminal prosecution within the meaning of the 5th and 6th Amendments; that such an inquiry may be properly devolved upon an executive department or subordinate officials thereof, and that the findings of fact reached by such officials, after a fair though summary hearing, may constitutionally be made conclusive, as they are made by the provisions of the act in question.'"

On appeal to the Supreme Court, Bridges v. Wixon, supra, that Court did not consider the constitutionality of the statute, but held that prejudicial error had been committed in the admission of evidence, and that the word "affiliation", as used in the statute, had been improperly construed by the lower courts. Accordingly the Supreme Court held that it was unnecessary to consider the larger constitutional questions raised by the petitioner.[23] However, Mr. Justice Murphy in a concurring opinion concluded that the statute was unconstitutional because it imputed guilt from association, and violated the First Amendment of the Constitution as to free speech and press.

Mr. Justice Murphy stated in his concurring opinion, 326 U.S. at page 161, 65 S.Ct. at page 1455:—"The power to exclude and deport aliens is one springing out of the inherent sovereignty of the United States. The Chinese Exclusion Case, Chae Chan Ping v. United States, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068. Since an alien obviously brings with him no constitutional rights, Congress may exclude him in the first instance for whatever reason it seems fit. Turner v. Williams, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979. The

---

23. That the statute was an ex post facto law; that petitioner was subjected to double jeopardy; that he had been denied equal protection of law; that the statute was violative of the right of free speech and freedom of assembly.

Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard them against any encroachment on those rights by federal or state authority. Indeed, this Court has previously and expressly recognized that Harry Bridges, the alien, possesses the right to free speech and free press and that the Constitution will defend him in the exercise of that right. Bridges v. [State of] California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 [159 A.L.R. 1346]."

Those who contend that the alien may not be deported for membership in the Communist Party rely mainly on the "clear and present danger" doctrine of Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470. See concurring opinion of Mr. Justice Murphy in the Bridges case. In the Schenck case the general secretary of the Socialist party was prosecuted for a conspiracy to violate the Espionage Act of June 15, 1917, 40 Stat. 217, 219 [1948 Revised Criminal Code, 18 U.S.C.A. § 2388] "by causing and attempting to cause insubordination, etc., in the military and naval forces of the United States, and to obstruct the recruiting and enlistment service of the United States" when the United States was at war with Germany. Mr. Justice Holmes wrote the opinion of the Supreme Court and stated, 249 U.S. at page 51, 39 S.Ct. at page 249:

"But it is said, suppose that that was the tendency of this circular, it is protected by the First Amendment to the Constitution. Two of the strongest expressions are said to be quoted respectively from well-known public men. It well may be that the prohibition of laws abridging the freedom of speech is not confined to previous restraints, although to prevent them may have been the main purpose, as intimated in Patterson v. [State of] Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879, 10 Ann.Cas. 689. We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. Aikens v. [State of] Wisconsin, 195 U.S. 194, 205, 206, 25 S.Ct. 3, 49 L.Ed. 154. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 439, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A., N.S., 874. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right. It seems to be admitted that if an actual obstruction of the recruiting service were proved, liability for words that produced that effect might be enforced. The statute of 1917 in § 4 * * * punishes conspiracies to obstruct as well as actual obstruction. If the act, (speaking, or circulating a paper,) its tendency and the intent with which it is done are the same, we perceive no ground for saying that success alone warrants making the act a crime. Goldman v. United States, 245 U.S. 474, 477, 38 S.Ct. 166, 62 L.Ed. 410. Indeed that case might be said to dispose of the present contention if the precedent covers all media concludendi. But as the right to free speech was not referred to specially, we have thought fit to add a few words."

Thus the right of freedom of speech is not so absolute that it cannot be re-

stricted by statute, in the interest of the public safety.

In Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L. Ed. 1138, the majority opinion discussed the right of a state to enact a statute which prohibited any person from advocating, advising, or teaching by word of mouth or writing, the duty, necessity or propriety of overthrowing or overturning organized government by force or violence. The following is quoted from the majority opinion of Mr. Justice Sanford, 268 U.S. at page 666, 45 S.Ct. page 630:

"It is a fundamental principle, long established, that freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom. 2 Story on the Constitution, 5th Ed., § 1580, p. 634; Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715; Patterson v. [State of] Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879, 10 Ann.Cas. 689; Fox v. [State of] Washington, 236 U.S. 273, 276, 35 S. Ct. 383, 59 L.Ed. 573; Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470; Frohwerk v. United States, 249 U.S. 204, 206, 39 S.Ct. 249, 63 L.Ed. 561; Debs v. United States, 249 U.S. 211, 213, 39 S.Ct. 252, 63 L.Ed. 566; Schaefer v. United States, 251 U.S. 466, 474, 40 S.Ct. 259, 64 L.Ed. 360; Gilbert v. [State of] Minnesota, 254 U.S. 325, 332, 41 S.Ct. 125, 65 L.Ed. 287; Warren v. United States, 10 Cir., 183 F. 718, 721, 33 L.R.A., N.S., 800. Reasonably limited, it was said by Story in the passage cited, this freedom is an inestimable privilege in a free government; without such limitation, it might become the scourge of the republic.

"That a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, or disturb the public peace, is not open to question. Robertson v. Baldwin, supra, 165 U.S. page 281, 17 S.Ct.

326; Patterson v. [State of] Colorado, supra, 205 U.S. page 462, 27 S.Ct. 556; Fox v. [State of] Washington, supra, 236 U.S. page 277, 35 S.Ct. 383; Gilbert v. [State of] Minnesota, supra, 254 U.S. page 339, 41 S.Ct. 125; People v. Most, 171 N. Y. 423, 431, 64 N.E. 175, 58 L.R.A. 509; State v. Holm, 139 Minn. 267, 275, 166 N.W. 181, L.R.A.1918C, 304; State v. Hennessy, 114 Wash. 351, 359, 195 p. 211; State v. Boyd, 86 N.J.L. 75, 79, 91 A. 586; State v. McKee, 73 Conn. 18, 27, 46 A. 409, 49 L.R.A. 542, 84 Am.St.Rep. 124. Thus it was held by this Court in the Fox case, that a State may punish publications advocating and encouraging a breach of its criminal laws; and, in the Gilbert case, that a State may punish utterances teaching or advocating that its citizens should not assist the United States in prosecuting or carrying on war with its public enemies.

"And, for yet more imperative reasons, a State may punish utterances endangering the foundations of organized government and threatening its overthrow by unlawful means. These imperil its own existence as a constitutional State. Freedom of speech and press, said Story, supra, does not protect disturbances to the public peace or the attempt to subvert the government. It does not protect publications or teachings which tend to subvert or imperil the government or to impede or hinder it in the performance of its governmental duties.

* * *

"That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear. Such utterances, by their very nature, involve danger to the public peace and to the security of the State. They threaten breaches of the peace and ultimate revolution.

* * *

"It [the State] cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or imminent and immediate danger of its own destruc-

tion; but it may in the exercise of its judgment, suppress the threatened danger in its incipiency. In People v. Lloyd, supra, [304 Ill. 23], page 35, 136 N.E. [505] 512, it was aptly said: 'Manifestly, the legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government without waiting until there is a present and imminent danger of the success of the plan advocated. If the State were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the overthrow of the government, when there would be neither prosecuting officers nor courts for the enforcement of the law.'[23a]

"We cannot hold that the present statute is an arbitrary or unreasonable exercise of the police power of the State unwarrantably infringing the freedom of speech or press; and we must and do sustain its constitutionality.

"This being so it may be applied to every utterance—not too trivial to be beneath the notice of the law—which is of such a character and used with such intent and purpose as to bring it within the prohibition of the statute. This principle is illustrated in Fox v. Washington, supra [236 U.S. 273], page 277, 35 S.Ct. 383; Abrams v. United States, 250 U.S. 616, 624, 40 S.Ct. 17, 63 L.Ed. 1173; Schaefer v. United States, supra, [251 U.S. 466], pages 479, 480, 40 S.Ct. 259 [64 L.Ed. 360]; Pierce v. United States, 252 U.S. 239, 250, 251, 40 S.Ct. 205, 64 L.Ed. 542, and Gilbert v. [State of] Minnesota, supra, [254 U.S. 325], page 333, 41 S.Ct. 125 [65 L.Ed. 287]. In other words, when the legislative body has determined generally, in the constitutional exercise of its discretion, that utterances of a certain kind involve such danger of substantive evil that they may be punished the question, whether any specific utterances coming within the prohibited class is likely, in and of itself, to bring about the substantive evil, is not open to consideration. It is sufficient that the stat-

ute itself be constitutional and that the use of the language comes within its prohibition.

"It is clear that the question in such cases is entirely different from that involved in those cases where the statute merely prohibits certain acts involving the danger of substantive evil, without any reference to language itself, and it is sought to apply its provisions to language used by the defendant for the purpose of bringing about the prohibited results. There, if it be contended that the statute cannot be applied to the language used by the defendant because of its protection by the freedom of speech or press, it must necessarily be found, as an original question, without any previous determination by the legislative body, whether the specific language used involved such likelihood of bringing about the substantive evil as to deprive it of the constitutional protection. In such case it has been held that the general provisions of the statute may be constitutionally applied to the specific utterance of the defendant of its natural tendency and probable effect was to bring about the substantive evil which the legislative body might prevent. Schenck v. United States, supra, [249 U.S. 47], page 51, 39 S.Ct. 247 [63 L.Ed. 470]; Debs v. United States, supra, [249 U.S. 211], pages 215, 216, 39 S.Ct. 252 [63 L.Ed. 566]. And the general statement in the Schenck case [249 U.S.] page 52, 39 S.Ct. [247], 249 [63 L.Ed. 470], that the 'question in every case is whether the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils,'—upon which great reliance is placed in the defendant's argument—was manifestly intended, as shown by the context, to apply only in cases of this class, and has no application to those like the present, where the legislative body itself has previously determined the danger of substantive evil arising from utterances of a specified character."[24]

---

23a The logic of this argument is very persuasive.

24. Mr. Justice Holmes in a dissenting opinion, 268 U.S. page 672, 45 S.Ct.

page 632, in which Mr. Justice Brandeis concurred admitted the Supreme Court did not adopt the "clear and present

Both the Schenck and the Gitlow cases were considered by the Eighth Circuit Court of Appeals in Dunne v. United States, 1943, 138 F.2d 137, 142 in passing upon the validity of a statute (18 U.S.C.A. § 10 now 18 U.S.C.A. § 2385) which provided that it shall be unlawful: "* * * to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence * * *."

The court analyzed the Schenck and Gitlow cases as follows:—

"The attack upon the validity of the Act which appellants base on the 'application' of the Act is the contention that the 'clear and present danger' doctrine of Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, controls a statute of this character and that the facts here fall outside of that doctrine. 'Where regulations of the liberty of free discussions are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression'. Thornhill v. State of Alabama, 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093. Whether the Act is of a character to be measured by the above doctrine and, if so, whether it meets such measurement are pertinent to the issue of validity.

"While the doctrine of the Schenck case 'has afforded practical guidance in a great variety of cases in which the scope of constitutional protections of freedom of expression was in issue' (Bridges v. State of California, 314 U.S. 252, 262, 62 S.Ct. 190, 193, 86 L.Ed. 192 [159 A.L.R. 1346] ), yet it is by no means of universal application. Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, definitely determines that the Schenck case doctrine is not applicable in situations where the legislative body has, by statute, determined that 'utterances of a certain kind involve such danger of substantive evil that they may be punished'. 268 U.S. at page 670, 45 S.Ct. at page 631, 69 L.Ed. 1138. The distinction between such cases and those to which the Schenck case doctrine is applicable is clearly stated in the Gitlow opinion at pages 670 and 671 of 268 U.S., 45 S.Ct. at page 631, 69 L.Ed. 1138. This distinction has not been departed from nor weakened by any subsequent holding of the Supreme Court but, to the contrary, has been recognized and applied. Cantwell v. State of Connecticut, 310 U.S. 296, 307, 308, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Herndon v. Lowry, 301 U.S. 242, 256–258, 57 S.Ct. 732, 81 L.Ed. 1066; Stromberg v. People of State of California, 283 U.S. 359, 368, 369, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484; Whitney v. People of State of California, 274 U.S. 357, 371, 372, 47 S.Ct. 641, 71 L.Ed. 1095."

Certiorari was denied in the Dunne case, 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476, November 22, 1943, and two petitions for a rehearing were likewise denied December 6, 1943 (320 U.S. page 814, 64 S.Ct. 260, 88 L.Ed. 492) and January 3, 1944 (320 U.S. page 815, 64 S.Ct. 426, 88 L.Ed. 493), by the same bench which decided Bridges v. Wixon, supra.

The deportation statute in the case at bar is very similar to the statute involved in the Gitlow case, and under the ruling in that case the "clear and present danger" test does not apply to a deportation proceeding, such as this.

The record in this deportation proceeding shows that the Communist Party of the United States of America, during the period in which the petitioner, Peter Har-

---

danger" test in two decisions handed down after the Schenck case. He said: "It is true that in my opinion this criterion was departed from in Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173, but the convictions that I expressed in that case are too deep for it to be possible for me as yet to believe that it and Schaefer v. United States, 251 U.S. 466, 40 S.Ct. 259, 64 L. Ed. 360, have settled the law. If what I think the correct test is applied it is manifest that there was no present danger of an attempt to overthrow the government by force on the part of the admittedly small minority who shared the defendant's views."

isiades, was a member, organizer, division executive and secretary of its Greek Bureau, advised, advocated and taught the overthrow of the government of the United States of America by force and violence, and circulated and distributed printed matter which so advocated. Section 137 of Title 8, U.S.C.A. is constitutional. The writ of habeas corpus is dismissed on the merits. The petitioner, Peter Harisiades, will be remanded to the custody of the respondent, the District Director of Immigration and Naturalization at the Port of New York, to be held for deportation pursuant to the warrant and order of deportation issued December 16, 1948.

Settle an order accordingly.